[L. A. No. 2155.   Department One.—March 16, 1909.]

MENTONE IRRIGATION COMPANY, Appellant, v. RED-
LANDS ELECTRIC LIGHT AND POWER COM-
PANY et al., Respondents.

ORDER DENYING NEW TRIAL—APPEAL—REVIEW OF FINDINGS—BILL OF
EXCEPTIONS.—On an appeal from an order denying a new trial,
specifications in the bill of exceptions, that the conclusions of law
embraced in the findings are erroneous, are not available.  They can
be reviewed only on appeal from the judgment, or from an order
made under sections 663 and 663½ of the Code of Civil Procedure.
Conclusions of law are superseded by the judgment.

RIPARIAN OWNERS—USE OF WATERS—RESTRICTIONS ON RIGHT.—A ripar-
ian owner, by reason of the situation of his land on the stream, has
the right to make any use of the waters of the stream beneficial to
himself on the riparian land which his situation enables him to make,
with certain qualifications, including those that if his use involves a
consumption of the water, he may not use more than his reasonable
share as compared with other riparian owners, and that he must not
pollute the water to the injury of others entitled to it, and that the
water he does not consume must be returned to the stream before it
passes his land.

ID.—DIVERSION OF WATER FROM NATURAL COURSE—GENERATION OF ELEC-
TRIC POWER.—Subject to such qualifications, a riparian owner may
use the water of the stream to generate electric power by means of a
power house situated on his riparian land, and may convey the electric
power so generated for use on non-riparian lands.  In availing him-
self of such use, the riparian owner may either use the water in its
natural course, or may turn it out of its natural channel at the
upper end of his land, carry it in an artificial channel over the land,
use it for generating power thereon and turn it back into the stream
within his lands below, provided such interference with natural con-
ditions does not unduly injure others who have rights in the water.

ID.—CONSTRUCTION OF FINDINGS—RIGHT TO ALL THE FLOW OF STREAM—
SURFACE AND UNDERFLOW.—A finding in this case that certain of the
defendants were entitled to "all of the flow" of a particular stream,
when considered in connection with other findings and with the
pleadings and the judgment, is construed as referring only to the
surface flow of the stream, and not as including the underflow, and
as so construed, such finding is held to be supported by the evi-
dence.

ID.—DIVERSION OF UNDERFLOW—RETURN OF WATERS TO NATURAL BED—
FINDINGS AND EVIDENCE.—In an action by a lower appropriator of
the underflow waters of a stream, to restrain upper riparian pro-

prietors from diverting the waters thereof in such a manner as to decrease the natural underflow, it is held, that the acts of the defendants complained of, in diverting the surface and underflow waters by means of a pipe-line, and then returning the commingled waters to the bed of the stream at a lower point, did not operate to diminish the natural underflow waters of the stream to which the plaintiff was entitled, and that findings to that effect were sustained by the evidence.

APPEAL from an order of the Superior Court of San Bernardino County refusing a new trial. Waldo M. York, Judge presiding.

The facts are stated in the opinion of the court.

Works, Lee & Works, and Harris & Harris, for Appellant.

H. H. Trowbridge, and Gregg & Surr, for Respondents.

SHAW, J.—The plaintiff, claiming as an appropriator of water from a stream known as Mill Creek, sues to enjoin alleged injurious diversions from the stream. Judgment was given in the court below in favor of the defendants. The appeal is from an order denying the motion of plaintiff for a new trial. The trial took place in March or April, 1904. For some reason, not explained in the record, the findings were not filed until June, 1906, and the bill of exceptions was not settled until June 14, 1907.

It is not claimed that the findings do not cover all the material issues. There are no specifications of errors of law occurring at the trial. The specifications in the bill of exceptions, that the conclusions of law embraced in the findings are erroneous, are not available on appeal from an order denying a new trial. The conclusions of law are always merged in and superseded by the judgment (*Roberts* v. *Hall*, 147 Cal. 437, [82 Pac. 66]), and, even if necessary thereto, they can be reviewed only on appeal from the judgment, or from an order made under sections 663 and 663½ of the Code of Civil Procedure. (*Swift* v. *Occidental etc. Co.*, 141 Cal. 165, [74 Pac. 700]; *Great Western G. Co.* v. *Chambers*, 153 Cal. 310, [95 Pac. 151]; *Kaiser* v. *Dalto*, 140 Cal. 167, [73 Pac. 828].) We think, however, that the points urged

by the appellant are fairly presented by the specifications of the insufficiency of the evidence to support the findings. The complaint was not verified, and, hence, the general denials of the answers put in issue all the material allegations.

The complaint in substance is as follows: The plaintiff is, and has been ever since December 1, 1887, the owner of the right to take and use all the water flowing above and below the surface of the ground on and along a certain tract of one hundred and sixty acres of land at the lower end of Mill Creek, through which tract said creek flows. Mill Creek rises in the San Bernardino Mountains and flows westerly about twenty-five miles to the plaintiff's land. The water of the creek consists of a stream flowing on the surface in connection and contact with an underflow through the porous material composed of sand, gravel, and boulders with which the channel is filled. This material is kept saturated and the underflow is supplied by waters sinking into it from the surface stream. The plaintiff obtains said water from the underflow of the creek, on the land aforesaid, by means of a tunnel extending into said porous material, beneath the surface of the ground. At that point there was ordinarily no surface flow of the creek. Some additional water from the underflow of the creek was obtained from springs rising in the vicinity, and also by means of an open cut on said land across and into the bed of the creek. These waters were appropriated and used for irrigation and domestic use on other lands not contiguous to the stream.

After the plaintiff had acquired these water-rights, the defendant, Redlands Electric Light and Power Company, which we will hereinafter call the Power Company, acting in concert with the other defendants, some forty-eight in number, whom we will call the Ditch Owners, made a dam in the creek, at a place about three miles above the plaintiff's tunnel, by which dam they diverted all of the surface flow of the creek, and three hundred miner's inches of the underflow thereof, into an impervious pipe, in which pipe they carried said waters down the cañon some fourteen thousand feet to a power house, where it was used by the Power Company for generating electric power. After passing through this power plant, these waters were turned into a rock-lined ditch, some six hundred feet in length, from which they

were discharged into the original bed of the creek and from thence flowed about one fourth of a mile to a dam of the Ditch Owners aforesaid and were there by them turned into their ditch and carried away and used on lands situated about Crafton and Redlands, not riparian to the stream. This dam is about half a mile above the plaintiff's tunnel. We will designate it in this opinion as the Crafton dam.

It appears by the findings and evidence that for many years before the construction of the plaintiff's tunnel, the Ditch Owners had diverted and used all waters of the creek usually flowing on the surface above the dam and that they had thereby acquired the paramount right to all of the surface flow reaching that point, to the extent of twenty-five hundred miner's inches. This maximum amount was a flow seldom attained by the stream, except in times of floods from heavy storms. For all practical purposes they possessed the right to divert all of the water of the creek which, under natural conditions, would usually flow on the surface at their dam. But they had not acquired and did not possess any right to take at that point any part of the underflow in order to obtain the twenty-five hundred inches. This right of the Ditch Owners is not directly alleged in the complaint, but it is conceded by the plaintiff and no complaint is made on that account. The gravamen of the plaintiff's action is the alleged interference by the defendants with the underflow, and the alleged diversion thereof into said pipe-line and by that means into said ditch at the Crafton dam, whereby it is prevented from reaching the gravel beds surrounding the plaintiff's tunnel.

In this behalf it is alleged that the effect of the diversion of the three hundred inches of the underflow into the pipe-line, and its discharge into the natural channel so near to the Crafton dam, was to carry it swiftly to the dam and thence into the ditch, giving it no sufficient time to penetrate into the gravels below, and consequently to dry up and diminish the underflow that would otherwise pass beneath the surface at the Crafton dam and thence down under the creek-bed to the tunnel, cut, and springs from which plaintiff obtained its supply, whereby the plaintiff was deprived of the three hundred miner's inches of the underflow to which it is entitled.

The plaintiff's claim is that this interference with this natural flow of the water is unlawful. Several reasons are advanced in support of this claim. The Power Company owns the land on which the power house stands, and all the intervening land between the power house and the dam at the head of its pipe-line, and all this land is riparian to Mill Creek. The electricity generated at the power house by the use of the water from the pipe is carried away to Redlands and other places not on the stream, and there used for light, heat, and power. The plaintiff makes the novel proposition that the use of the water to generate electric power by means of a power house situated on riparian land is not a use within the scope of the riparian rights which attach to the land, unless the electric power is not only generated upon that land, but is also applied and used within its confines. There is no merit in this proposition. The riparian owner, by reason of the situation of his land on the stream, has the right to make any use beneficial to himself on the riparian land which his situation enables him to make, except that, if his use involves a consumption of the water, he may not use more than his reasonable share as compared with other riparian owners, and that he must not pollute the water to the injury of others entitled to it, and that the water he does not consume must be returned to the stream before it passes his land. (Gould on Waters, secs. 204, 208, 213; 2 Farnham on Waters, sec. 495, p. 1645, sec. 471, p. 1591, secs. 475, 476; *Gould* v. *Eaton,* 111 Cal. 639, [52 Am. St. Rep. 201, 44 Pac. 319]; *Bathgate* v. *Irvine,* 126 Cal. 144, [77 Am. St. Rep. 158, 58 Pac. 442].) There may be other qualifications of his right, but they do not affect the present question. The use of the water in its passage through his land to operate a power plant thereon is as clearly within his rights as is his right to operate a mill thereon with which to grind grain or to operate any other machinery, than which there is no more ancient or well-established feature of riparian rights. The theory of the plaintiff on this point would seem to come to this, that in the process the water is in some way transformed into electricity and, in that form, is carried away and used on non-riparian land. If this were correct, perhaps the use would not be included in the riparian right and perhaps even a prior appropriator below could prevent such use if it worked injury to his right. But no such

thing occurs. The water is not changed into electricity, nor carried away by the process. It is not the water that becomes electricity. It is the force of gravity, the weight of the water, which turns the wheels, and, being converted into electric power, is carried away on the wires, the water itself being turned back into the stream, precisely as in the case of its use to turn an ordinary mill-wheel.

The Power Company, being the owner of the riparian land, has the full right to use the water in its natural course on its land for that purpose. It has also the right, if it is more convenient and effective so to do, to turn it out of its natural channel at the upper end of its possessions, carry it in an artificial channel over the land, use it for generating power thereon, and turn it back into the stream within its lands below, provided such interference with natural conditions does not unduly injure others who have rights in the water. (Gould on Waters, sec. 213; Farnham on Waters, sec. 495, p. 1645.) Hence, if this diversion of the water from the natural channel causes a diminution of the underflow which would otherwise go to plaintiff's use, and an addition to that which naturally would go to the Ditch Owners, and the plaintiff's rights under its appropriation are prior, in point of time, to the diversion by the pipe-line, we have little doubt that the plaintiff would be entitled to some relief. On behalf of the Power Company it is argued that this diversion on its riparian land is an exercise of its riparian rights, of which a prior appropriator below cannot be heard to complain. This may be admitted for argument's sake so far as the Power Company is concerned, for it does not diminish the quantity of water, nor consume it, but turns it all back into the stream above the lower boundary of its land. But it is alleged that the Power Company and the Ditch Owners, by this method of carrying the water, have taken up part of the underflow which would naturally have gone to plaintiff's use and have caused it to run into the ditch at the Crafton dam as an artificial increase of the surface stream going to the Ditch Owners. If this were true, the plaintiff might, at least, be entitled, as against the Ditch Owners, to have this artificial increase of the surface stream delivered to it at the Crafton dam, or at that point turned into the natural channel below the dam, where it might sink into the gravels and feed the plaintiff's source of supply. It is unnecessary

to inquire further as to the precise extent and form of the relief to which plaintiff might be entitled in the case supposed, since we have reached the conclusion that the findings of the court that the plaintiff's water supply is not affected and that the plaintiff is not damaged by the action of the defendants must be sustained.

The plaintiff insists that the court has found that the Ditch Owners, in order to obtain the maximum flow of twenty-five hundred miner's inches, to which they are entitled, have the right to take up all of the underflow, at the dam or elsewhere, if necessary, and has decided that this contingent right to the underflow is paramount to the right of the plaintiff to have the underflow pass under the dam for its use. One paragraph of the findings states that, by reason of the porous character of its bed, some of the water of Mill Creek sinks below the surface of the ground and forms a subterranean stream, in addition to the surface flow and in direct contact with it. At another place the findings state that the Ditch Owners are entitled to take and use "all of the flow of the said Mill Creek, to the extent of 2500 inches of water," miner's measurement. These findings, if considered together, but apart from the context, are somewhat ambiguous and might be understood to give the Ditch Owners a right to take out at their dam the underflow there running as well as the surface stream. But when considered in connection with the other parts of the findings and with the pleadings and judgment, we think it is clear that the court intended to refer only to the surface flow by the phrase "all of the flow of the said Mill Creek" in the foregoing passage. Any other construction would make this finding contrary to all the evidence and to the repeated concessions of both parties throughout the trial. There was no contention, or attempt to prove, that the Ditch Owners ever had, or ever claimed to have, the right to take any water other than the entire stream flowing on the surface of the ground at the Crafton dam, or that they ever claimed the right to take at that point any of the water there flowing beneath the surface in the interstices of the porous material. The contention that this finding is contrary to the evidence would be well taken if the finding could properly be construed to include such underflow, but it is without foundation when the finding is given its true meaning as referring solely to the surface stream there flowing.

Furthermore, if construed as claimed by the plaintiff, this finding would be outside of the issues. There is no averment that the Ditch Owners claimed the right to go below the surface at the Crafton dam and take out the underflow or that they had done so or threatened to do so. No issue was tendered on that subject by the complaint. The thing complained of, as before stated, is the taking up of the underflow at a point nearly three miles above the Crafton dam, and carrying it down in a pipe so that it reached the Crafton dam as surface flow instead of underflow, and, as part of a surface stream, was there taken into the defendants' ditch by means of the dam that was used to divert the stream prior to the construction of any pipe-line.

The main question of fact in the case arises upon those findings which involve the right of the defendants to maintain the diversion through the pipe-line, and the effect of that diversion upon the amount of underflow going to plaintiff's tunnel, cut, and springs. The court found, in effect, that the subterranean water diverted and carried down the cañon in said pipe-line and by that means mingled with the natural surface flow and turned into the defendants' ditch at the Crafton dam, did not constitute any part of the subterranean waters which would naturally flow to and feed the plaintiff's source of supply, and that the interference with natural conditions did not operate to diminish plaintiff's supply. If this is true, the diversion by means of the pipe-line would cause no damage to plaintiff. The court, accordingly, expressly found that the plaintiff was not damaged by the acts of the defendants.

We think these findings are supported by sufficient evidence. There was evidence to the effect that although the diversion of all the surface and subterranean flow into the pipe-line at the upper dam caused the surface stream to disappear in the natural creek-bed from that place of diversion down to the point where the water was again returned from the pipe-line to the natural bed, a few hundred feet above the Crafton dam, there was, nevertheless, enough water from other sources coming into the creek-bed and into the channel below the head of the pipe-line and above the Crafton dam, to fill all the porous material of the cañon at that dam to overflowing, thereby contributing some water to the surface stream, with the result that there was more water in the surface stream at the Crafton dam than was discharged from the pipe-line.

In other words, the evidence tended to contradict the allegation of the complaint that the underflow was fed from the surface flow at the point in the course of the creek immediately above the Crafton dam, and, on the contrary, it indicated that at that point the underflow fed and increased the surface stream. From these facts the conclusion is reasonable and, indeed, almost irresistible, that the bed of the cañon, so called, and the porous material thereof containing the underflow, was filled to its utmost capacity at the Crafton dam and that not only did the normal quantity continue to pass the dam as underflow and find its way to plaintiff's diversion works, after the construction of the pipe-line as before, but that some of the underflow was forced up to the surface at that point. This, according to the evidence, was caused by a narrowing of the cañon at that place diminishing the carrying capacity of the porous material composing the bed of the creek. It would follow from these conditions that the addition of more water to the natural channel above the Crafton dam could add nothing to the underflow at the dam, and would serve only to increase the quantity of the surface stream going to the Ditch Owners or into the bed of the creek below, if it was more than their maximum allowance. It may be conceded that there was evidence tending to show that the stream did not increase between the Crafton dam and the power house and that this, if true, would justify a different conclusion. But this amounts to a mere conflict in the evidence, or in the inferences reasonably deducible therefrom. In such cases the decision of the trial court is as conclusive as where the conflict arises directly from the evidence. (*Barker* v. *Gould,* 122 Cal. 240, [54 Pac. 845] ; *Yarwood* v. *West etc. Co.,* 132 Cal. 208, [64 Pac. 275].)

The grade of the bed of the creek is very steep, being about two hundred and fifty feet per mile, and from this fact the plaintiff argues that if the creek-bed above were kept filled for its whole length, there would be more pressure and the underflow would pass under the Crafton dam with greater velocity, and, consequently, in greater quantity, than when filled only for a short distance above the dam. This is, perhaps, a problem in the science of hydraulic engineering. The experts in that science, or some of them, who testified at the trial, declared that no such effect would follow, and if such evidence is competent this would be sufficient to support the

finding. If we consider it as a matter of judicial cognizance, we are of the opinion that the engineers were right. If the underlying porous material in which this underflow runs had constituted a confined conduit or was covered by impervious material, so that little water could escape, and it were kept full for its entire length of three miles, with a total fall of seven hundred and fifty feet in that distance, of course the pressure would cause tremendous velocity at the point of discharge. But it bears no resemblance to such a conduit. It has no impervious covering, but is at all points open on the surface, and the excess of the underflow at any point would pass at once into and become a part of the surface stream. It can maintain no more pressure than a surface stream or open flume of equal grade. If such a flume of that length and grade were kept filled by discharges into it at a point half a mile above its lower end, the velocity below that point would be as great as if it were filled for its entire length above it, and any addition at any point farther above would merely cause an overflow at the place of minimum capacity, and would add nothing to the velocity below such overflow. If we suppose that one person had the right to take from such a flume all the water except that flowing in the lower six inches of a cross-section of the flume and another person below had the right to this lower six inches, we have conditions substantially identical with the case at bar. If such flume were kept filled only a short distance above the place of diversion, the person below would receive the same amount of water as if it were filled at its upper end and ran full for its entire length. The engineers referred to gave testimony substantially to this effect. In the present case there would be, of course, a very slight increase in the pressure upon the underflow from any increase in the depth of the surface stream at the dam, but it is not seriously claimed that this few inches in increased height of the surface of the stream would have any appreciable effect upon the velocity of the underflow at the dam or on the amount thereof that would find its way to plaintiff's supply.

The evidence also showed that the plaintiff's supply absolutely ceased for several years, and this, it is claimed, demonstrates the injury arising from the pipe-line. But this failure is accounted for by the fact that it occurred during an ex-

cessive and prolonged drouth, continuing for the unprecedented period of four years, during which, even in the rainy seasons, no water flowed past the Crafton dam over the gravel beds containing plaintiff's supply, whereas in ordinary years there was, during a considerable portion of each rainy season, large quantities of water flowing over these gravel beds, into which it would sink and be kept stored until the dry seasons, then to supply the plaintiff's tunnel.

The conclusion we have reached as to the sufficiency of the evidence to support these findings renders the other findings immaterial. If the acts of the defendants do not damage the plaintiff and do not diminish the water which would naturally flow to its place of diversion, it is immaterial whether the pipe-line diversion was made before or after the inception of the plaintiff's appropriation, or whether the place where the water was turned back into the natural channel of the creek was, as the findings state, one thousand feet above the Crafton dam, or less than that distance. We find no ground upon which it can be said that there is not sufficient evidence to support the findings.

The order is affirmed.

Angellotti, J., and Sloss, J., concurred.