[Sac. No. 3846. In Bank.—September 1, 1927.]

## FALL RIVER VALLEY IRRIGATION DISTRICT, a Body Politic and Corporate, Appellant, v. MT. SHASTA POWER CORPORATION (a Corporation), Respondent.

[1] WATERS AND WATER RIGHTS—RIPARIAN RIGHTS—VESTED RIGHTS.— A riparian right is a vested property right inhering in and a part and parcel of the abutting land—not gained by use or lost by disuse—a right (qualified only by the correlative rights of other riparian proprietors) to use the entire ordinary and natural flow of the stream for all lawful riparian uses and also to have all such flow come down to the land undiminished other than by the lawful uses by upper riparian proprietors or by the rights of those who have otherwise obtained a superior claim to the use of a portion of the stream; and this right to use the water of a stream is entitled to the same respect and protection at the hands of the law as any other vested property right.

[2] ID.—MODIFICATION OF COMMON LAW—VESTED RIGHTS.—While the legislature has the power to modify or abrogate a rule of the common law, no such change can affect the previously vested rights of property owners.

[3] ID. — POLICE POWER — ACT OF JUNE 16, 1913. — While riparian rights may, under proper circumstances, yield to the police power in the interests of public health, safety, comfort, or welfare, the Water Commission Act of 1913 (Stats. 1913, p. 1012) does not purport to be an exercise of such power for any purpose.

[4] ID. — WATER COMMISSION ACT — PERMIT TO DEVOTE WATERS TO NONRIPARIAN LANDS.—Where the court finds that the waters of a stream are less than that reasonably required by all riparian owners and appropriators for irrigation, watering livestock and domestic use, the provisions of the Water Commission Act of 1913 cannot aid one holding a permit to divert waters from the stream to nonriparian lands for irrigation purposes.

[5] ID.—USE FOR POWER PURPOSES.—The use of the ordinary flow of a stream for power purposes is a well-known riparian use.

1. Nature of riparian rights, note 20 **Am. St. Rep.** 225. See, also, 25 Cal. Jur. 1060, 1064, 1068, 1135.
   4. See 25 Cal. Jur. 1125.
   5. See 25 Cal. Jur. 1071.

[6] ID.—APPROPRIATOR—WHEN TRESPASSING.—A mere appropriator of water, until he obtains title by prescription, is, as against the rights of a riparian owner, a trespasser.

[7] ID. — DIVERSION OF WATERS FOR POWER PURPOSES — CONDUIT TO NONRIPARIAN LAND.—A power company diverting all of the waters of a stream to its plant used for generating hydroelectric power on riparian lands and returning said waters to the stream from said riparian lands is making a legitimate riparian use of the waters, and the fact that the waters are conducted through a tunnel or conduit across nonriparian lands is immaterial.

[8] ID.—CONSENT TO DIVERSION—CONDEMNATION.—Where the rights of riparian owners intervening between the point of diversion and point of return of the water to the stream, in such a case, have been obliterated by condemnation, this is equivalent to the consent of all the land owners below to the upper diversion.

[9] ID.—PERMIT FROM STATE WATER COMMISSION TO DIVERT WATERS—PRIOR RIGHTS.—One holding a permit from the State Water Commission to divert waters of a stream to nonriparian lands for irrigation purposes has no legal standing as against a power company which has been diverting all of the waters of the stream for the purpose of generating hydroelectric power on riparian lands, the rights of which corporation were acquired prior to the passage of the Water Commission Act under which the permit was granted.

---

(1) 40 Cyc., p. 560, n. 47, p. 561, n. 51. (2) 12 C. J., p. 186, n. 86, p. 932, n. 33, p. 956, n. 55. (3) 12 C. J., p. 960, n. 24. (4) 40 Cyc., p. 704, n. 11. (5) 40 Cyc., p. 570, n. 33. (6) 40 Cyc., p. 708, n. 36. (7) 40 Cyc., p. 608, n. 52.

APPEAL from a judgment of the Superior Court of Shasta County. C. J. Luttrell, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. D. Tillotson, Jesse W. Carter and Barry S. Ulrich for Appellant.

William B. Bosley, Thomas J. Straub and Chenoweth & Leininger for Respondent.

Samuel C. Wiel, *Amicus Curiae.*

---

6. See 26 Cal. Jur. 102.

PRESTON, J.—The purpose of this action is to settle and determine the respective claims of plaintiff and defendant to the waters of Fall River in Shasta County. By its second amended and supplemental complaint plaintiff claims a right to the first continuous flow of said stream as against defendant to the extent of 240 cubic feet per second, basing said claim upon the provisions of two permits issued by the division of water rights of the state department of public works and hereinafter more fully described. Defendant by its amended answer denied the validity of both said permits; denied that on the twenty-seventh day of September, 1919, or thereafter, there was any water subject to appropriation flowing in said stream, and alleged its ownership of riparian rights and lands riparian to Fall River and Pit River below the points of diversion specified in said permits; its construction, ownership, and operation of a hydroelectric power plant located upon said riparian lands, and its ownership of the right, qualified only by the correlative rights of other riparian owners, to divert and use, for the operation of its said power plant, all water naturally flowing in said Fall River.

The following is a brief outline of the facts, which are virtually undisputed, as found by the court:

Fall River, a non-navigable natural stream or watercourse, whose sources are in the northwesterly part of Fall River Valley in Shasta County, California, flows in a general southeasterly direction to its junction with Pit River at the village of Fall River Mills. Its natural flow is nearly constant, varying but little throughout the year, the average flow being approximately 1,400 cubic feet per second and the maximum flow approximately 1,800 cubic feet per second. No evidence was offered tending to show it has ever overflowed its banks. Its principal tributary is Tule River, whose main sources are in the northerly part of Fall River Valley. Pit River rises in the northeasterly part of the state and flows in a general southwesterly direction past defendant's power plant to its junction with the Sacramento River.

On the said twenty-seventh day of September, 1919, Guy T. Wayman applied to the state water commission of the state of California for a permit to divert water from said

Fall River at a point on the southerly or right bank thereof for the purpose of irrigating 4,320 acres of nonriparian agricultural land situated in Fall River Valley. On the nineteenth day of June, 1920, he applied for a similar permit to divert water at a point on the easterly or left bank of said river for the purpose of irrigating 15,680 acres of nonriparian agricultural land situated in said valley.

On August 10, 1921, two permits, numbered 898 and 899, respectively, granting said applications "subject to vested rights," were issued to him "as trustee for an irrigation district, mutual water company, or other legal entity authorized by law to carry on the work of diversion and distribution of water, such legal entity to be composed of the owners of land to be served under this permit as issued or as modified hereafter . . . said trustee to transfer and assign all rights under this permit to said legal entity as soon as possible after its organization." Said permits provided that actual construction work should begin on or before November 1, 1921; that it should be completed on or before November 1, 1923, and complete application of the water to the proposed use should be made on or before July 1, 1924. The said permits were thereafter duly recorded. The times specified therein within which to commence construction work and apply said waters to the beneficial use of irrigating said lands were extended by the division of water rights from time to time up to the first day of January, 1926.

On November 29, 1921, said Guy T. Wayman duly assigned all his right, title, and interest in and to said permits to John F. Sheehan, Jr., the original plaintiff in this action. Complaint was filed by him on June 21, 1922. On July 10, 1922, the Fall River Valley Irrigation District was duly organized under the laws of the state of California as an irrigation district. On August 9, 1922, said John F. Sheehan, Jr., duly assigned all his right, title, and interest in and to said permits to said Fall River Valley Irrigation District, and said district was duly substituted as plaintiff herein on October 20, 1922.

The court found that the said Fall River Valley Irrigation District was formed by the owners of the lands for whose benefit said permits were issued, and in order to carry out the conditions set forth therein; that it had acquired by

grant from Scott McArthur, in October, 1922, and was at all times thereafter the owner of the right to use said lands at the points on said Fall River specified in the aforesaid permits for purposes of appropriation; and also for construction, maintenance, and operation of diversion works; that said district consisted of two separate divisions or parcels of land totaling in area 13,000 acres, all of which were susceptible of reasonable and economical irrigation; that 130 cubic feet of water per second flowing continuously was the maximum amount of water reasonably required for such irrigation; that said lands were of no value except for agricultural purposes; that neither said district nor either of its predecessors, Wayman and Sheehan, had ever commenced or caused to be commenced actual construction work for the purpose of diverting or appropriating any part of the waters of said Fall River under the authority of either of the aforesaid permits or otherwise.

The court further found that all lands upon which the points of diversion specified in said permits were located and practically all lands riparian to Fall River from a place several miles above the uppermost point of diversion to the junction of Fall and Pit Rivers; also, all lands riparian to Pit River from its junction with Fall River down to a point below defendant's power-house were held in private ownership and were not public lands of the state or the United States; that plaintiff had never owned any part of the lands riparian to Fall or Tule Rivers and did not own any riparian right to the waters of Fall River.

On the contrary, the court found defendant to be the owner and in possession of the bed and banks of Fall River and of all lands riparian thereto between a point some distance above its diversion dam hereinafter mentioned and the junction of Fall River with Pit River, and also to be the owner of the bed and banks of Pit River and all lands riparian thereto between a point some distance above the junction of said river with Fall River and a point some distance below defendant's power plant, with the exception of two tracts, from the owners of which defendant had acquired by condemnation proceedings their riparian rights to the use of the waters of said Fall River.

It further found that defendant, being the owner of the riparian lands and riparian rights aforesaid, had con-

structed a diversion dam and all necessary works in the bed and banks of said Fall River on said riparian lands for the purpose of diverting into an aqueduct all of the water naturally flowing in said river; that it had also constructed said aqueduct, extending from said dam to and through its power-house and thence to the channel of Pit River; also, that it had constructed said power-house, by means of which substantially all of the water naturally flowing in Fall River is used for the generation of electric power; that the greater part of said aqueduct is on lands of respondent which are not riparian to either Fall River or Pit River; but said power-house is on lands riparian to Pit River; that the construction of said plant was commenced about June 1, 1920, completed in September, 1922, and has been in operation continuously since November 1, 1922, using substantially all of the water naturally flowing in Fall River at the site of its said dam and discharging all of said water so used into Pit River before it leaves defendant's land.

The court found that defendant acquired part of its aforesaid riparian lands and riparian rights prior to September 27, 1919, and the remainder between that date and November 1, 1922, said lands having previously been owned in severalty by approximately forty different proprietors; that at no time either before or after September 27, 1919, had any of the water of said Fall River been appropriated, diverted, or used by any persons except owners of lands riparian thereto, but that it had been diverted and used by such riparian owners, a small hydroelectric power plant having been in operation near the junction of Pit and Fall Rivers prior to the above date, which plant was acquired by defendant on June 30, 1920.

The court also found that no appropriations had ever been made under sections 1410 to 1422 of the Civil Code, or under the Water Commission Act of any of the waters of said stream.

The court also found that "for a long time prior to and on the 27th day of September, 1919, and at all times thereafter until on or about the 30th day of September, 1922, when the defendant herein began its diversion of water from said Fall river for the operation of its said power plant, the water flowing in Fall river, at each of the points of diversion specified in the aforesaid applications and per-

mits and thence in the channel of said Fall river to its junction with Pit river and thence in the channel of Pit river to and beyond the place where the tailrace of defendant's said power plant discharges into said Pit river, exceeded by more than two hundred forty (240) cubic feet per second, not only all amounts then being actually diverted or used by riparian owners and appropriators for beneficial purposes, but also the total amount of water reasonably required by all riparian owners and appropriators for irrigation, watering live stock, and domestic use upon all lands riparian either to said Fall river or to said Pit river between the upper of the two points of diversion specified in the aforesaid applications and permits and the place where defendant's tailrace discharges into said Pit river.''

Lastly, it found that all of the waters naturally flowing in Fall River and its tributaries were and had been since January 1, 1919, reasonably needed for useful and beneficial purposes upon lands riparian thereto, and more particularly upon the aforesaid lands owned by defendant riparian to Fall and Pit Rivers; that after commencement of operation of defendant's said power plant in 1922 substantially all of such waters were actually used for a useful and beneficial purpose, to wit, generation of electric power.

From its findings the court concluded that said permits were not void because issued to a trustee for an irrigation district thereafter to be organized, or because plaintiff and its predecessors failed to commence construction work within the time specified therein, but that they were both void and of no force or effect by reason of the fact that no part of the water naturally flowing in Fall River below a point several miles upstream from the upper point of diversion specified in said permits or of the water naturally flowing in Pit River between its junction with Fall River and a point below the outlet of defendant's said aqueduct was or at any time since January 1, 1919, had been public water of the state of California subject to appropriation under the provisions of the ''Water Commission Act''; that plaintiff did not own any vested or inchoate right to take or divert water from Fall River, but that defendant was the owner and in possession of the vested right, qualified only by correlative rights of other riparian owners, to use all water naturally flowing in said Fall River upon its lands riparian

thereto and to Pit River for all lawful purposes, including the production of electric energy by means of its said hydroelectric plant.

With findings such as appear above and the act of June 16, 1913, to apply thereto, appellant claims to have secured from the natural flow of Fall River a definite and integral portion thereof to the extent of 130 cubic feet per second. The consequence of the doctrine thus contended for would, in our opinion, be a limitation upon the riparian right by fixing a definite amount of the natural and usual flow of the river which may be sequestrated therefrom and given to nonriparian proprietors under a system of permits operated under state authority. The quality of the riparian right would thus be changed by taking from it elasticity and relativity and substituting therefor an inflexible limitation beyond which the right may not extend. Variable factors, such as yield of the stream, variation in the relative and correlative needs of the proprietors, would no longer be controlling. After a definite amount of water has been taken, the right to regain it would be lost to the riparian owner. The title in the appropriator or permittee would be good and valid, subject only to forfeiture by failure for a given period to use the water, as is now the case of any other prescriptive right. No errors as to needs or potential needs of the riparian proprietor may be corrected under this system. This change it is claimed may be legally effected by defining the riparian right to be a mere rule of property and not a vested estate.

It is only fair to counsel to say that since the filing of the briefs in this action we have given the subject of riparian rights our serious consideration in the case of *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607]. In fact, at varying intervals during the past seventy-seven years in the history of this state, the doctrine of riparian rights, as we conceive it to be, has withstood determined assaults, similar to if not identical with the one here made. At no time has there been any uncertainty as to the ingredients, quality, or strength of the right. On the faith of the doctrine practically all valuable land titles in this state have passed into private ownership. In *Herminghaus* v. *Southern California Edison Co. et al., supra,* we re-

examined the question and pronounced the riparian right a vested one.

The facts presented in the case at bar give perhaps as clear a picture as could possibly be found of the exterior limitations of the right. Fall River is a constant stream. It is but little influenced by either rainfall or melting snows. It has an underground source, which is practically constant. There is no overflow of its banks during any period of the year. There are, therefore, no "storm," "freshet," "flood," "vagrant," or "enemy" waters in it, and hence no waters in which the riparian right does not inhere.

Appellant in this case has neither the right of a riparian proprietor nor that of an appropriator of the stream. It claims merely an inchoate right derived from permits issued by the state of California to appropriate waters of the stream "subject to vested rights." It has so far reduced no water or water right to its possession.

As against this claim, we have respondent, a large power company, espousing the cause of the riparian owner. It claims no more for itself than it concedes to the smallest and humblest proprietor on the stream. Within less than ten years after the passage of said statute, it has constructed a hydroelectric plant upon its riparian lands and since November 1, 1922, it has actually used the entire yield of the stream by passing it through its said generating plant and producing thereby electric energy which has been and is now being consumed in various portions of the state by the public generally. No effort has been made by it to reservoir or otherwise unreasonably or illegally detain the waters nor to divert them to nonriparian land or to otherwise use them for nonriparian purposes. Here, indeed, there is no question as to the relative rights to the underflow or overflow of the stream. No complaint can be made that the riparian owner is greedy or selfish in wanting the entire hydraulic effect of the stream to "boost" to its own lands the small amount of water required for irrigation or domestic purposes. In short, respondent has upon its own riparian land put the whole of said stream to a recognized beneficial use. Upon what logical basis can we defend our position should we declare the right to take away the whole or any part of this riparian right, or, if our power to do so be conceded, where shall we begin and to what extent may we go?

To curtail the right by a fixation of rigid and inelastic boundaries is to destroy the right altogether, for in such case it would become a mere right of priority, or, in other words, it would be tantamount to the substitution of the doctrine of appropriation for the doctrine of riparian rights. A re-examination of the nature of the riparian right in the light of the facts of this case leaves us entirely satisfied with our previous pronouncements upon this subject.   [1] We, therefore, here, reassert the riparian right to be a vested property right inhering in and a part and parcel of the abutting lands—a right not gained by use or lost by disuse— a right (qualified only by the correlative rights of other riparian proprietors) to use the entire ordinary and natural flow of the stream for all lawful riparian uses and also to have all such flow come down to the land undiminished other than by the lawful uses by upper riparian proprietors or by the rights of those who have otherwise obtained a superior claim to the use of a portion of the stream.   This right to use the water of the stream we hold to be entitled to the same respect and protection at the hands of the law as any other vested property right.

Admittedly there has been a persistent policy on the part of the legislative department of this state to curtail in some way this riparian right in favor of nonriparian proprietors. In fact, an extra session of the legislature of the state was called in the summer of 1886, following the decision in *Lux* v. *Haggin,* 69 Cal. 255 [4 Pac. 919, 10 Pac. 674], on April 26, 1886.   The object of this extra session was to consider what should be done in the promotion of the common weal to offset the declarations of this court made in said case, upholding the doctrine of riparian rights in practically the same form as we now have it.   Nothing resulted from the deliberations of the legislature on that occasion.   Agitation of the same character was unsuccessfully urged upon the court in 1909, when this court, in *Miller & Lux* v. *Madera etc. Co.,* 155 Cal. 59 [99 Pac. 502], met the contention that the riparian right was but a mere rule of policy by saying (p. 65) : ''But the riparian owners have a right to have the stream flow past their land in its usual course, and this right, so far as it is of regular occurrence and beneficial to their land is, as we have frequently said, a right of property, 'a parcel of the land itself.'   Neither a court nor the

legislature has the right to say that because such water may be more beneficially used by others it may be freely taken by them. Public policy is at best a vague and uncertain guide, and no consideration of policy can justify the taking of private property without compensation. If the higher interests of the public should be thought to require that the water usually flowing in streams of this state should be subject to appropriation in ways that will deprive the riparian proprietor of its benefit, the change sought must be accomplished by the use of the power of eminent domain.''

An assault equally vigorous was made upon said doctrine in the case of *Herminghaus* v. *Southern California Edison Co., supra,* and, as above stated, we again re-examined the question and gave the response above noted.

We have no means of ascertaining which of the two systems, appropriation or riparian rights, would have been the wiser for California to have adopted in the beginning. Certainly, a comparison of the progress of this state with the progress of other western states, which have applied the doctrine of appropriation, does not furnish proof of a lack of wisdom on the part of the first legislature of California, which after the closest and most earnest investigation adopted the rule of the American common law in this state, which had as one of its tenets the riparian right essentially as we now declare it to be (Appendix, 1 Cal., pp. 588–604).

It must here be observed that all the riparian lands between respondent's point of diversion and point of return passed into private ownership prior to April 8, 1911. This statement is also true as to the riparian lands between appellant's uppermost point of intended diversion and the diversion dam of respondent, except one forty-acre tract. The riparian right of respondent vested, therefore, before any of the legislation beginning with the amendment of April 8, 1911 (Stats. 1911, p. 821), to section 1410 of the Civil Code and ending with the act of June 16, 1913 (Stats. 1913, p. 1012), which act was held up by referendum and did not go into effect until December, 1914. Section 11 of said act, in so far as here involved, reads:

'' . . . And all waters flowing in any river, stream, canyon, ravine or other natural channel, excepting so far as such waters have been or are being applied to useful and beneficial purpose upon, or in so far as such waters are or may

be reasonably needed for useful, and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is and are hereby declared to be public waters of the State of California and subject to appropriation in accordance with the provisions of this act. If any portion of the waters of any stream shall not be put to a useful or beneficial purpose to or upon lands riparian to such stream for any continuous period of ten consecutive years after the passage of this act, such non-application shall be deemed to be conclusive presumption that the use of such portions of the waters of such stream is not needed upon said riparian lands for any useful or beneficial purpose; and such portion of the waters of any stream so non-applied, unless otherwise appropriated for a useful and beneficial purpose is hereby declared to be in the use of the state and subject to appropriation in accordance with the provisions of this act.''

[2] As an exercise of the police power of the state it is claimed that this act may operate upon the riparian rights of proprietors on Fall River so as to transfer to appellant at least 130 cubic feet per second constant flow from the usual and natural flow of the stream. The total invalidity of this provision of the statute as such is really not contended for by respondent. It is a misconception of the case of *Herminghaus* v. *Southern California Edison Co., supra,* to say that it was there held that said provision was in complete conflict with the state or federal constitutions in any particular. The holding was that under the facts of that case the stream carried during the season in question no waters in which the riparian right did not inhere and also that respondents were making a beneficial use of the entire ordinary and natural flow of said stream as it flowed along, across, and over their said lands. No question can arise as to the power of the legislature to modify or abrogate a rule of the common law. The question is: Can any such change affect the previously vested rights of property owners? We need here only say that the legislative department of the state may not take any portion of a vested property right from one person and invest another with it and be justified in so doing in view of the provisions of sections 13 and 14 of article I of the state constitution and the fourteenth amendment to the constitution of the United States.

In *Stone* v. *Kendall* (Tex. Civ. App.), 268 S. W. 759, the court said: "Since the right of a citizen to use his property as he chooses, so long as he harms nobody, is an inherent and constitutional right, the police power cannot be invoked to prohibit a particular use of private property, unless such use reasonably endangers or threatens the public health, safety, comfort, or welfare."

In the case of *Reagan* v. *Farmers Loan & Trust Co.*, 154 U. S. 362, 399 [38 L. Ed. 1031, 14 Sup. Ct. Rep. 1047, 1055, see, also, Rose's U. S. Notes], the court said: "In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

To the same effect, see *Coal & Coke Ry. Co.* v. *Conley and Avis,* 67 W. Va. 129, 188 [67 S. E. 613], *Barbier* v. *Connolly,* 113 U. S. 27, 31 [28 L. Ed. 923, 5 Sup. Ct. Rep. 357, see, also, Rose's U. S. Notes], *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, 559 [46 L. Ed. 679, 22 Sup. Ct. Rep. 431], and *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79, 87 [46 L. Ed. 92, 22 Sup. Ct. Rep. 30], in which latter case the above quotation is cited with approval. This was our view when considering section 1410 of the Civil Code, as amended, which section is much akin to section 11 of the act of June 16, 1913. See *Palmer* v. *Railroad Com.,* 167 Cal. 163, 175 [138 Pac. 997], and *San Bernardino* v. *City of Riverside,* 186 Cal. 7 [198 Pac. 784].

[3] We are by no means intending to say that riparian rights may not under proper circumstances yield to the police power in the interest of public health, safety, comfort, or welfare, but the act of June 16, 1913, does not purport to

be an exercise of such power for any purpose nor do the facts in the present case give rise to a situation where the police power may operate. See *Herminghaus* v. *Southern California Edison Co., supra* (p. 25), where we said: "If the state were here essaying to uphold an effort on its part to work out impartially, unselfishly and in the interests of the whole people some general plan or system for the equitable adjustment of rights and uses in its flowing streams with a view to the conservation, development and distribution of the dynamic forces and generative and fertilizing fructibilities of their waters, it might well be argued that public policy, public interest and a most liberal interpretation of the police powers of the state might rightfully be invoked in support of such an effort. But can the same be properly said or claimed in a case wherein one or many privately owned and operated institutions, organized primarily for personal and private gain, and only incidentally and secondarily assuming to act in the public interest and welfare, are engaged in controversies in the courts with other private individuals or associations over the asserted and disputed property rights and interests of each of the respective parties to such controversies? We do not feel called upon in this case to so declare."

See, also, dissenting opinion of Mr. Justice Burnett in the case of *In re Hood River*, 119 Or. 312 [227 Pac. 1065].

[4] We therefore hold the said provision of the act of June 16, 1913, to be inoperative to the aid of appellant or the injury of respondent. Moreover, assuming the said statute, and every portion thereof, to be valid and at the same time to be applicable to water rights which vested prior to its passage, it does not and cannot avail appellant to infuse life into the permits here under consideration in view of the particular facts found by the court in this case. For it must be carefully noted that the court here did not find the existence of surplus water to any extent in this stream. It found only that the amount used and the amount reasonably required by all riparian owners and appropriators "for irrigation, watering live stock, and domestic use" was less than the product of the stream by more than 240 cubic feet per second. [5] This finding, it will be noted, ignores absolutely the use of the ordinary flow of the stream for power purposes, an ancient and well-known

riparian use. This use is declared in *Mentone Irr. Co.* v. *Redlands Elec. Light & Power Co.,* 155 Cal. 323, 327 [100 Pac. 1082, 1083], as follows: "The use of the water in its passage through his land to operate a power plant thereon is as clearly within his rights as is his right to operate a mill thereon with which to grind grain or to operate any other machinery, than which there is no more ancient or well-established feature of riparian rights."

Indeed, the court not only did not find a general surplus of water in said stream, but specifically found that "all of the waters naturally flowing in said Fall River and in the tributaries thereof are, and ever since January 1, 1919, have been, reasonably needed for useful and beneficial purposes upon lands riparian thereto, and, more particularly, upon the aforesaid lands owned by the defendant as aforesaid, which are riparian to said Fall River and to said Pit River; and, ever since the construction and completion of defendant's said dam, aqueduct and power plant and the commencement of the operation thereof by the defendant in the autumn of 1922, substantially all of such waters, except only such parts thereof as have actually been diverted or used by the owners of lands riparian to said Fall River and its said tributaries above or upstream from the site of defendant's aforesaid dam, have actually been used by the defendant for a useful and beneficial purpose, to-wit, the generation of electric power, as hereinbefore stated."

We have proceeded thus far upon the assumption that respondent was making a lawful riparian use of the stream. We have not overlooked the contention of appellant that such is not the case. We have thus ignored the claim because respondent is admittedly the owner of large areas of riparian land below the places of intended diversion by appellant under its permits for appropriation. Conceding to respondent no greater rights than could be enjoyed by the smallest riparian proprietor on the stream, we have reached the conclusion announced above, for it is possible that any number of riparian owners upon said stream could and might want to use the normal flow of said stream for mill, power, or other purposes. [6] Then, too, we must give effect to our own decisions pronouncing that a mere appropriator, until he obtains title by prescription, is, as against the right of a riparian owner, a trespasser. The

case of *Pabst* v. *Finmand,* 190 Cal. 124, 132 [211 Pac. 11,
14], involved a controversy over an alleged claim by appro-
priation as against a claim by virtue of ownership of ripa-
rian lands situated below the point of diversion.   The court
said: "As to a nonriparian owner the riparian owner is
under no duty to share the waters of the creek and the
slightest use by such nonriparian owner diminishes to some
extent the flow of the stream."

In the case of *Duckworth* v. *Watsonville Water & Light
Co.,* 150 Cal. 520 [89 Pac. 338], we held that every owner of
land upon a stream had the right to insist that the water
as it passed his land should not be "diminished from use
by other riparian owners above, so as to deprive him of his
just portion, and perhaps, as to other than riparian owners,
the right to prevent any substantial diminution of the
amount of water which would naturally flow to his land."

In the case of *Anaheim Union Water Co.* v. *Fuller,* 150
Cal. 327 [88 Pac. 978], plaintiffs, as riparian owners, sued
to enjoin defendants from diverting water from the Santa
Ana River at a point above their riparian lands.   The court
said: "Here the defendants were not, with respect to the
land irrigated, riparian owners, but were trespassers on
plaintiffs' property rights from the beginning. . . . "

In the case of *Huffner* v. *Sawday,* 153 Cal. 86, 91 [94 Pac.
424, 426], the court said: "Even if these plaintiffs (riparian
land owners) had never made any use of the water flowing
past their land, they had the right to have it continue in
its customary flow, subject to such diminution as might
result from reasonable use by other riparian proprietors.
This is a right of property, a 'part and parcel' of the land
itself (citing the Duckworth case, *supra*). . . . "

In the case of *Davis* v. *Martin,* 157 Cal. 657, 659 [108
Pac. 866], it was held that "the riparian rights attaching to
said lands by reason of this contiguity were paramount to
the rights of any appropriator," and in *Title Ins. & Trust
Co.* v. *Miller & Lux, Inc.,* 183 Cal. 71, 85 [190 Pac. 433],
that the "right of each riparian proprietor as against ap-
propriators, extends to the entire stream."

[7]   But under the doctrine of the cases of *Turner* v.
*James Canal Co.,* 155 Cal. 82 [99 Pac. 520], and *Mentone
Irr. Co.* v. *Redlands etc., Co., supra,* it must be held that re-
spondent is making a legitimate riparian use of the stream

by the construction and operation of its hydroelectric plant in the manner set forth in the findings herein, and the fact that the tunnel or conduits may be through or across nonriparian lands is immaterial. In *Turner* v. *James, supra,* defendant, as a riparian owner of lands on Fresno Slough, claimed the right to take for irrigation of said lands a reasonable quantity of the water of San Joaquin River at the head of its canal on the river, and to carry said water through the canal over the intervening nonriparian land to the land on the slough. The court said: ''The fact that it must carry the water from the river over intervening nonriparian lands, belonging to other persons, is of no consequence. The person over whose land it is carried could object, of course, but other riparian owners have no privity with such third person, and cannot avail themselves of his rights. So long as the riparian owner takes no more than his reasonable share and uses it upon his riparian land, without unreasonable waste, other riparian owners below have no right to inquire how, or by what means, or at what place, he manages to divert his share from the stream, whether at a point on his land, or at some point far above, where the elevation of the stream will be sufficient to carry it by gravity to the surface of his land, or whether by a dam and headgate, or by pumps and buckets. This principle was practically decided in *Charnock* v. *Higuerra,* 111 Cal. 479 [52 Am. St. Rep. 195, 32 L. R. A. 190, 44 Pac. 171], and *Rose* v. *Mesmer,* 142 Cal. 329 [75 Pac. 905].''

In *Mentone Irr. Co.* v. *Redlands etc. Co., supra,* the court held: ''The Power Company, being the owner of the riparian land, has the full right to use the water in its natural course on its land for that purpose. It has also the right, if it is more convenient and effective so to do, to turn it out of its natural channel at the upper end of its possessions, carry it in an artificial channel over the land, use it for generating power thereon, and turn it back into the stream within its lands below, provided such interference with natural conditions does not unduly injure others who have rights in the water. (Gould on Waters, sec. 213; Farnham on Waters, sec. 495, p. 1645.)''

[8] The fact that the riparian rights of the two land owners intervening between the point of diversion and point of return have been obliterated by condemnation is certainly

the equivalent of consent within the meaning of the doctrine in *Turner* v. *James, supra,* and the case is as though all land owners below had consented to the upper diversion. The fact that thereby the respondent has secured a 450-foot head and been enabled to develop a large amount of electric energy in no way detracts from the legality of the process. Then, too, as against all riparian owners between the point of diversion and point of return of the waters to the stream, a public use has intervened and a cause of action would not lie in them to enjoin or prevent respondent from making the use it now makes of the stream.   See *Miller & Lux* v. *Enterprise C. etc. Co.,* 169 Cal. 415 [147 Pac. 567], and other cases.

It is hard to conceive, therefore, that appellant, claiming as an upper intending appropriator, can have any standing to urge the objections which have not been made and, indeed, which have been lost by the riparian owners, if any there be, who are affected by this diversion above them. [9] We, therefore, hold that appellant is without legal standing to urge a claim as to the use of these waters on the part of respondent.

These views compel affirmance of the judgment, and it is so ordered.

Richards, J., Seawell, J., Langdon, J., and Waste, C. J., concurred.

SHENK, J., Concurring.—I concur in the judgment for the reason that the evidence showed and the court found (1) that all of the waters naturally flowing in Fall River and its tributaries are and ever since January 1, 1919 (a point of time antedating the applications of the plaintiff's predecessors in interest), have been reasonably needed for useful and beneficial purposes upon the lands riparian thereto, and more particularly upon the lands owned by the defendant which constitute all of the riparian lands between the defendant's point of diversion and its power plant and which riparian lands or rights the defendant had acquired by purchase or condemnation; and (2) that substantially all of said waters, except only such parts thereof as have been diverted or used by the owners of lands riparian to Fall River above the defendant's diversion dam, have, since the

autumn of 1922, actually been put to a reasonably useful and beneficial purpose. The court was, therefore, justified in concluding that no portions of such waters were "public waters of the State of California" at the time the applications for said permits were made. No question of the validity of section 11 of the Water Commisison Act may properly arise in this case for the obvious reason that under the express provisions of that section, waters flowing in any river or stream which "are or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto," are excepted from the waters which are declared by the act to be "public waters of the State" and subject to appropriation under provisions of the act. Nor had the ten-year period after the effective date of the act, also prescribed by section 11, expired when the defendant commenced the construction of its works.

It is apparently conceded in the main opinion that the riparian right may yield to the proper exercise of the police power in the interests of the people of the state, but it is asserted that the Water Commission Act does not purport to be an exercise of such power for any purpose. To this assertion I cannot accede. It was the obvious purpose of section 11 of the act to subject the exercise of the riparian right to the reasonable use of the waters of the stream and to declare in the interests of the people of the state that the use of all waters shall be restricted to that which is reasonable and useful for a beneficial purpose, whether the user be a riparian owner or an appropriator. The right of the riparian owner to the full use of the waters of the stream in so far as the same may be put to a reasonably useful and beneficial purpose may not be abridged. The result of the main opinion, however, is to further entrench such owner in what may be entirely unreasonable, demands— a result which the Water Commission Act was plainly and properly designed to avoid.

A situation is presented in this case which was not intended to be affected or disturbed by the Water Commission Act in the exercise of the police power. Such being the fact, it would seem to require no argument or citation of authority to support the right of the defendant as riparian owner to the full enjoyment of the reasonably beneficial use to which the waters of the stream are put. The said per-

mits were in fact issued "subject to vested rights." All discussion in the main opinion in defense of riparian rights and as to the scope of the police power applicable to the exercise of such rights is, therefore, under present law, in my opinion, entirely outside of the issues necessary to be determined in this case on the record presented, and is uncalled for except, perhaps, in justification of the opinion of a majority of the court in the Herminghaus case, concerning which I have had occasion to express my views.

Rehearing denied.