[L. A. No. 12834. In Bank.—April 3, 1933.]

GIN S. CHOW et al., Appellants, v. CITY OF SANTA BARBARA (a Municipal Corporation) et al., Respondents.

674

676

James F. Peck, Charles F. Blackstock and Elizabeth M. Maxwell for Appellants.

William P. Hubbard, as *Amici Curiae* on Behalf of Appellants.

J. F. Goux, City Attorney, Heaney, Price & Postel and W. H. Irving for Respondents.

SHENK, J.—This is an appeal by the plaintiffs from a judgment declaring the rights of the respective parties in and to waters of Santa Ynez River and denying the application of the plaintiffs for an injunction.

The Santa Ynez River is an innavigable stream having its source on the northerly and westerly slopes of the Santa Ynez and San Rafael Mountains in Santa Barbara County, and flows in a general westerly direction for a distance of about 100 miles to the Pacific Ocean.

The plaintiffs are the owners of lands within the bed and bordering upon the Santa Ynez River and its tributaries. The defendants are the City of Santa Barbara, a municipal corporation, and the Montecito County Water District. The lands of the respective defendants are contiguous and are situate on the coastal or southerly slope of the Santa Ynez Mountains, that is, over the divide and away from the watershed of the Santa Ynez River.

In the year 1877, when the population of the territory within the present boundaries of the defendants was about 2,000 people, the surface supply of water on the coastal slope of said mountains was exhausted and consistent efforts were made thereafter to secure a sufficient supply of water to meet the public needs of this area, which is constantly increasing in population. The Santa Ynez watershed affords the only available and adequate supply for this area.

In April, 1904, the City of Santa Barbara acquired what is known as the Gibraltar dam site, across the Santa Ynez River; also rights of way in the Santa Ynez Mountains for the purpose of constructing a tunnel, called the Mission

tunnel, which would connect the reservoir created by the proposed dam with the water distributing system of the city. In October, 1904, the city caused a notice of appropriation to be posted on the banks of the Santa Ynez River, whereby it claimed the right to appropriate, divert and take 250,000 miner's inches of water measured under a four-inch pressure, the same to be applied in supplying the area in and near said city and the inhabitants thereof with water. This notice was duly recorded. Thereafter the Mission tunnel was bored and was completed in 1911. The Gibraltar dam was completed in 1920 and during each year thereafter and until the commencement of this action (August 6, 1928), water has been impounded in said dam, diverted therefrom and devoted to a public use within the limits of the city to the maximum annual amount of 4,189 acre-feet. The maximum capacity of the Gibraltar dam is 15,374 acre-feet.

In its effort to obtain an adequate water supply the City of Santa Barbara also acquired the Juncal dam site, which is situate in the Santa Ynez River channel upstream and above the Gibraltar dam.

The defendant water district was organized in 1921 for the purpose of acquiring water rights and constructing works to increase the water supply necessary to be furnished to lands within the district and to the inhabitants thereof. An agreement was entered into between the city and district whereby the city agreed to convey the Juncal dam site to the district, together with the right to the waters appurtenant thereto or which might be impounded thereby. It had been the intention of the city to impound waters of said river by a dam to be built at the Juncal dam site, the same being a part of the plan contemplated by the city at the time of posting and recording the notice of appropriation in 1904. The city agreed to convey to the water district a part of its appropriation right. In reliance upon this agreement the water district, in 1924, began the construction of a tunnel, known as the Doulton tunnel, through the Santa Ynez Mountain range, from a point in the southerly slope thereof in Toro Canyon to a point on the river downstream and west from the Juncal dam site. This tunnel was completed in April, 1928. The charter of the City of Santa Barbara, adopted in 1927, authorized the city to convey its

real estate, water and water rights and privileges in connection therewith, but only upon the approval of the grant by the electors of the city. On March 20, 1928, at an election held in the city for that purpose, the officers of the city were authorized to execute a deed to the water district conveying the rights agreed to be conveyed in 1924. This deed was executed and delivered to the district on March 26, 1928. Thereafter the district began the construction of the Juncal dam on said dam site, and it is the intention of the district to impound by means of said dam and to divert by means of the Doulton tunnel 2,000 acre-feet of water per annum for the necessary uses and purposes of the district. The conveyance from the city to the district we hold sufficient as between the parties for the purposes intended thereby.

The drainage area of the Santa Ynez River and its tributaries is approximately 900 square miles, of which 219 square miles are above the Gibraltar dam, and 576 square miles of which lie between Gibraltar dam and Robinson's bridge, which bridge is below Gibraltar dam and thirteen miles easterly from the mouth of the Santa Ynez River. The tributaries of the river are four creeks entering it above Gibraltar dam and nine creeks entering it at distances from fourteen miles to fifty miles above the ocean. The average annual runoff of all of the waters of the drainage area of the river above Gibraltar dam is 55,000 acre-feet, and the average annual runoff of the entire drainage area above Robinson's bridge is between 150,000 and 200,000 acre-feet.

The lands of the plaintiffs are described in the complaint and are owned by them in common or in severalty. Of these lands 11,784.4 acres border upon and the waters thereon drain into the Santa Ynez River; 5,548 acres border upon and are drained by the tributaries of the river; 1954.6 acres are severed from the land bordering upon and draining into the river, and 1900 acres are drained directly into the Pacific Ocean.

The defendants claim the right as appropriators to impound and divert water from the watershed of the Santa Ynez River at points at or above the Gibraltar dam, to the capacity of said dam by the city, and to the extent of 2,000 acre-feet per annum by the district.

The plaintiffs brought this action to have it decreed that the defendants have no right to impound or divert, above the lands of the plaintiffs, any of the waters of the Santa Ynez River or its tributaries or to intercept percolating waters moving through the body of said mountains to said river; to have it decreed that the plaintiffs are entitled, as against the defendants, to have all the waters of the river and its tributaries, and all water percolating through the mountains into the river, flow through and by their lands as such waters have been wont to flow in the course of nature, without interruption, interception or interference by the defendants; that the defendants be enjoined from diverting or impounding any of the waters of said river or its tributaries, and be enjoined from intercepting any of the percolating water on its course to said river.

The issues were joined and after trial the court made extensive findings generally in favor of the defendants and from conclusions of law drawn therefrom entered the judgment from which this appeal is taken.

The appeal is taken on the judgment-roll alone. On such an appeal the power of the reviewing court is necessarily restricted. In such case "the findings are conclusively presumed to be supported by the evidence; furthermore it is elementary that they are to receive, if possible, such a construction as will uphold rather than defeat the judgment thereon; they are to be liberally construed and, if possible, any ambiguity or inconsistency will be resolved in favor of sustaining the judgment". (*Ochoa* v. *McCush,* 213 Cal. 426, 430 [2 Pac. (2d) 357, 359]; 2 Cal. Jur. p. 690 et seq.) The judgment may be reversed only upon some fatal error appearing on the face of the judgment-roll. (*Miller & Lux* v. *Enterprise Canal etc. Co.,* 145 Cal. 652 [79 Pac. 439].) On an appeal on the judgment-roll alone every presumption and intendment is resolved in favor of the regularity of the proceedings in the trial court. (*Johnston* v. *Callahan,* 146 Cal. 212 [79 Pac. 870].) A finding capable of two reasonable constructions must be interpreted according to the one that sustains the judgment, and a finding must be given such a construction, if a reasonable one, as will support the judgment. (*E. W. McLellan Co.* v. *East San Mateo L. Co.,* 166 Cal. 736 [137 Pac. 1145].) In

the absence, as here, of the transcript of the evidence, it will be presumed that facts found not within the formal issues were supported by evidence introduced by the parties under stipulation or without objection. (*Hoover* v. *Lester,* 16 Cal. App. 151 [116 Pac. 382].)

With the foregoing rules in mind we proceed to examine the findings, conclusions of law and the judgment, and the attack the plaintiffs make upon them.

The facts as above related are found by the court and are not called into question. The court made additional findings hereinafter set forth, many of which are unchallenged and such as are questioned will be discussed.

The right of the city to continue to impound and devote to a public use 4,189 acre-feet of water is not questioned in this action.

In further describing the location and nature of the watershed and the character and habits of the river and the rainfall and runoff in its drainage area, the court found that all the water captured by percolation as the result of the construction of the Mission and the Doulton tunnels did not and never could, in a state of nature, percolate into or become a part of the flow of the Santa Ynez River. It also found that the average annual precipitation in said region is 15.81 inches; that approximately ninety per cent of the total seasonal runoff in the watershed occurs during the months of December, January, February, March and April; that none of the lands of the plaintiffs are overflowed by the waters of said river, except some portions thereof near the mouth of the river and except also certain portions thereof within the flood channel of the river; that the flood channel of the river is from fifteen to fifty feet in depth with uniformly precipitous sides or banks; that from April to November the quantity of water flowing in said river is confined to a limited area of the channel; that the flow of said river is erratic and variable and is directly dependent on the occurrence and the intensity of rainstorms which occur almost entirely during the winter months and which almost invariably occur simultaneously at all points in and around the drainage basin of the river; that during and for a few days after the occurrence of such rainstorms torrential floods are produced which sweep down the flood channel of

the river seaward in increasing volume; that less than one-third of the flood and other water of the river originates on the drainage area above the Gibraltar dam and more than two-thirds thereof in the remaining area below said dam; that these torrential floods are confined to the flood channel of the river and sweep down the entire channel of the river with increasing volume, occasionally carrying trees and brush, silt and sand and other material and above said dam on widely separated occasions have moved rocks and boulders; that the most part of said flood waters is discharged into the sea and is lost to all beneficial and useful purposes; that the heavy rainstorms and consequent freshets and torrential floods described "are not of regular, anticipated or annual occurrence, and intervals of two years and more at times occur between said storms. Such freshets and torrential floods are in excess of the regularly recurring and of the usual, ordinary and customary flow of said river; that . . . the usual, ordinary and customary flow of said river, while varying in amount from day to day and from year to year, consists of such waters as flow therein independently of and not as a result of the heavy rainstorms and torrential floods in this finding described"; that the water intended to be impounded, diverted and used by the defendants "is not and cannot be of any use or benefit to, or capable of being put to any beneficial use or purpose by the plaintiffs, or any of them, on their respective riparian lands"; that when all of the lands bordering upon said river and its tributaries and riparian thereto, susceptible of irrigation, and all of the lands overlying said basin are irrigated and when all of the water impounded and diverted and intended to be impounded and diverted by the defendants, has been so impounded and diverted, an average annual quantity of water equal to 121,000 acre-feet will then be discharged into the sea and lost for any beneficial or useful purpose; that the defendants "can without injury to the plaintiffs or any of them or to their respective riparian lands, impound the storm, flood and freshet flow of said river . . . sufficient in amount to enable defendants in the aggregate, to divert annually sixteen thousand acre feet, including the 4189 acre feet of water as to which the defendant city is the owner of the right to divert".

It was further found that "all the water of said river proposed to be hereafter impounded and diverted by the defendants, and each of them, over and above the quantity of water that the defendant City of Santa Barbara has been hereinabove found to have acquired the right to impound and divert, is surplus, storm, flood and freshet water; none of such water is a part of the usual, ordinary and customary flow of said river; none of said storm, flood and freshet water, so proposed to be impounded by defendants, is required to replenish and maintain the underground body of water percolating through and being in said Santa Ynez Valley basin, or for any other useful or beneficial purpose, but on the contrary, the supply of water in said basin will be fully maintained and replenished by the flow of said river which is not interfered with by defendants; the impounding and diversion of said storm, flood and freshet water by said defendants in the manner proposed will not diminish in any amount or interfere at all with the usual, ordinary and customary flow of said river; said water, so proposed to be impounded and diverted by said defendants, is not of regular occurrence, and is not and cannot be, of any use or benefit to, or capable of being put to any beneficial use or purpose by said plaintiffs, or any of them; nor is the same now, or can the same in the future be, beneficial to the respective riparian lands of said plaintiffs, or to any of said lands; said plaintiffs have no right, title or interest in or to the storm, flood and freshet flow of said river proposed to be impounded and diverted by said defendants''.

The findings thus far stated are to the effect that the waters to be impounded and taken by the defendants are extraordinary storm waters of the river and not a part of the usual and customary flow of the stream. As such they support the conclusions of law and the judgment on the doctrine of *Gallatin* v. *Corning Irr. Co.*, 163 Cal. 405 [126 Pac. 864, 866, Ann. Cas. 1914A, 74], and cases to like effect. In the Gallatin case Gallatin and others owned lands riparian to Elder Creek and South Elder Creek. They prayed for an injunction against the defendants therein from diverting the water of South Elder Creek so as to prevent the same from flowing down the natural channel thereof and upon the lands of the plaintiffs, who alleged

that said waters were necessary for irrigation and that the defendants intended to take a large quantity of water from said creek to nonriparian lands and outside the watershed of the creek. The defendants therein, as have the defendants herein, denied that they intended to take any of the waters of the stream during irrigating season, or any of the "ordinary flow" at any season, and alleged that they intended only to take from said creek "the flood waters flowing therein" during the winter months to the extent of 5,000 inches and carry the same to nonriparian lands; that during those months the creek carried flood waters which flowed unobstructed through the lands of the plaintiffs to the Sacramento River; that such flood waters were unnecessary for any beneficial purpose on the lands of the plaintiffs, and that if the defendants did not take the proposed 5,000 inches the same would run into the river and serve no useful purpose. The trial court in that case found that the usual and normal flow of the creek "including not only the flow in the dry season, but also the usual normal flood waters in the winter or wet season from rains and melting snows" equaled at least 5,000 inches, but that such quantity did not include the waters that came down the stream in times or seasons of unusual freshets and floods. It appeared that the defendant company intended to construct a headgate which would receive and divert approximately 5,000 inches of the water when the stream rose to the top of the aperture in the headgate, and that the diversion of that quantity of flood waters during said months would in nowise damage the plaintiffs. There was also evidence that at times there was a very heavy volume of water flowing down the creek, but the banks were high enough to confine the water along the whole course, except near the Sacramento River.

The facts in the Gallatin case are almost identical with the facts in the case at bar, thus far appearing. In affirming the judgment for the defendants this court said: "These facts present the question whether or not flood waters, of the character proposed to be diverted from South Elder creek by the company, may lawfully be taken from the stream for use upon nonriparian lands and outside of the watershed of the stream, without the consent of the riparian owners and without compensating them therefor. In other

words, whether the right to have such flood waters flow down the stream in its usual course, under the circumstances here disclosed, is one of the riparian rights attached to lands abutting upon the stream, as parcel thereof, which the owner of such lands may enforce against one who proposes to divert the same to nonriparian lands, where no use is made of such waters on the riparian land and no benefit accrues to riparian land from their passage over the bed of the stream, and no damage is caused to the riparian land from the proposed diversion.

"The question is not entirely new in this state. In *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772], *Miller & Lux* v. *Madera etc. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391, and *Miller & Lux* v. *Enterprise Co.*, 145 Cal. 652 [79 Pac. 439], the question of the right to divert flood waters was considered in cases where the trial court had decided that they formed a part of the regularly recurring flow of the stream during a considerable period of each season, or where it appeared that such flood waters were necessary to supply the gravel strata and artesian basins under the lands of a valley, from which water was obtained to supply the overlying lands. These cases are not parallel to the case at bar. The case of *Anaheim, etc.*, v. *Fuller*, 150 Cal. 327 [88 Pac. 978, 11 L. R. A. (N. S.) 1062], is cited by the appellant. It does not decide anything at all concerning flood waters. The portion of the opinion in which such waters are mentioned merely declares the rule that a riparian owner may enjoin a diversion of the ordinary flow without a showing of present damage. This is decided in many other cases, but none of them lays down any rule with respect to riparian rights in flood waters such as those involved here.

"In *Edgar* v. *Stevenson*, 70 Cal. 286 [11 Pac. 704], *Heilbron* v. *76 Land & Water Co.*, 80 Cal. 194 [22 Pac. 62], *Modoc etc. Co.* v. *Booth*, 102 Cal. 151 [36 Pac. 431], *Fifield* v. *Spring Valley W. W.*, 130 Cal. 552 [62 Pac. 1054], and *San Joaquin etc. Co.* v. *Fresno Flume Co.*, 158 Cal. 626 [112 Pac. 182, 36 L. R. A. (N. S.) 832, the court was dealing directly with the question of riparian rights in flood waters. The last named case is the latest statement by this court

upon the subject. It appears to be direct authority for the contention of the defendants. . . .

■ "These decisions in effect establish the just rule that flood waters which are of no substantial benefit to the riparian owner or to his land, and are not used by him, may be taken at will by any person who can lawfully gain access to the stream, and conducted to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him. They are not a part of the flow of the stream which constitutes 'parcel' of his land, within the meaning of the law of riparian rights.

"This rule does not conflict with the decisions in the Bay Cities and Miller & Lux cases first above cited. In those cases the water in question, although in a sense high water, or flood water, was nevertheless a part of the regular and usual flow of the stream for a considerable part of each year and at a time when such flow was of substantial use and benefit to the riparian lands, or the flow of such waters in their accustomed place was necessary to the gathering of water in subterranean strata from which the owners of overlying land were entitled to take it. The decisions were based on these facts, neither of which exists here, according to the findings."

The foregoing excerpt adequately distinguishes the case of *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772], and *Miller & Lux* v. *Madera etc. Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], so earnestly relied upon by the plaintiffs herein and holds the doctrine of the Gallatin case not inconsistent with the holding of those cases. The same characteristics distinguish the other cases relied upon by the plaintiffs on this branch of the present case.

In this connection the case of *Hilbert* v. *City of Vallejo*, 19 Fed. (2d) 510, is instructive and, in its essentials, directly in point. That case was decided in May, 1927, by the Circuit Court of Appeals for the Ninth Circuit, and the opinion was written by Judge Hunt. It involved an appeal from an order of the District Court of the United States denying an injunction *pendente lite*. The plaintiff therein was the owner of a large tract of land riparian to Suisun Creek, which rises in Gordon and Wooden Valleys in Napa

County. Suisun Creek is a natural stream with well-defined channels and banks. It has a considerable fall from its upper portions and empties into Suisun Bay. The city of Vallejo chose a dam site in Gordon Valley and had constructed a dam of sufficient size to impound all of the waters of Gordon Creek, intending to store in the reservoir behind the dam 10,000 acre-feet of water, if that quantity was available from storm waters, and to divert therefrom 5,058 acre-feet of water annually. The evidence on behalf of the plaintiff tended to show that upon rainfall of any consequence on the watershed, greater increased flow would occur for a short period of time, but that thereafter the stream would either stop flowing entirely or would flow in very small quantities; that it was uncertain when rainfall might occur, but that the heavy flow and then a recession would probably occur at least twice every winter or spring, and frequently during each winter and spring; that the usual and the ordinary flow of the stream is not only the few second-feet which flow therein during times when rainfall is not occurring on the watershed, but includes the greater flow thereof, as well as the lower flow. On behalf of the defendants it appeared that the watershed lacked heavy snowfalls but was very steep and mountainous, and that below the dam Gordon Valley Creek runs through a narrow and precipitous canyon; that the rainfall occurs between December and April, and that within the watershed at irregular times there were unusual rainstorms, at which times the waters of the creek rose rapidly within a few hours, and became flood and freshet waters, and flowed down the creek with great velocity into Suisun Bay where they were lost; that when the rainstorms ceased the waters fell, and within two to six hours disappeared into the bay; that such flood and freshet waters continued only during such rainstorms, but that when the storms ceased the waters returned to their normal, usual and ordinary flow; that the usual and normal flow as thus defined did not exceed three second-feet from December to April; that the defendants had constructed a by-pass at the dam so that from two to twenty second-feet could be let down, as might be deemed to be the usual and ordinary flow; that it was not the intention of the city, nor will it be, to impound any of the usual and ordinary flow of the stream, and that no damage would result by the impound-

ing and diverting of said waters by the city. The district court found in accordance with the showing made by the defendants. After relating in substance the foregoing facts the court said: ''The established doctrine of the California decisions is that the right to the flow of water is annexed to the soil not as an easement or appurtenance but as a parcel (*Miller & Lux* v. *Madera Canal Co.*, 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391]), and that the rights of a riparian proprietor are not limited to a body of water which flows in the stream at the period of greater scarcity, but include the ordinary and usual flow of the stream (*Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607]). But, as has often happened before in California, in cases where riparian rights have been asserted, the controversy resolves itself into ascertaining what constitutes the usual and ordinary flow of the stream to which the lands are riparian.

''Appellant's position is that under the evidence the admittedly greatly increased flow of Gordon valley creek, though only occurring at times, is not less usual or ordinary than the much-diminished flow which comes after the rains and melting snows have run off, while the city contends that the waters which flow down during and soon after the unusual rainstorms are in excess of the ordinary and usual flow, are of no substantial benefit to appellant or her lands, and therefore may be taken without her consent and without compensation.

''It being appropriate that we should conform our views to the decisions of the highest court of the state, we must give attention to *Gallatin et al.* v. *Corning Irrigation Co.*, (1912) 163 Cal. 405 [126 Pac. 864, Ann. Cas. 1914A, 74], where the situation was quite like that in the case at bar.'' The pertinent facts in the Gallatin case are then stated and the court continued: ''The court, through Justice Shaw, met the question whether or not 'flood waters' of the creek proposed to be diverted could lawfully be taken from the stream for use upon nonriparian lands, and outside of the watershed of the stream, without consent of the riparian owners, and without compensating them therefor. 'In other words', said the learned justice, 'whether the right to have such flood waters flow down the stream in its usual course, under the circumstances here disclosed, is one of the ripa-

rian rights attached to lands abutting upon the stream, as parcel thereof, which the owner of such lands may enforce against one who proposes to divert the same to nonriparian lands, where no use is made of such waters on the riparian land and no benefit accrues to riparian land from their passage over the bed of the stream, and no damage is caused to the riparian land from the proposed diversion.' Many earlier decisions were cited, including *San Joaquin etc. Co.* v. *Fresno Flume Co.,* 158 Cal. 626 [112 Pac. 182, 35 L. R. A. (N. S.) 832], and *Fifield* v. *Spring Valley Water Works,* 130 Cal. 552 [62 Pac. 1054], as establishing the rule that flood waters which are of no substantial benefit to the riparian owner or to his land, and are not used by him, 'may be taken at will by any person who can lawfully gain access to the stream, and conduct it to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him'. The court said: 'They are not a part of the flow of the stream, which constitutes ''parcel'' of his land, within the meaning of the law of riparian rights.' There can be no misunderstanding of this language. It has clearly defined the rights of a riparian proprietor in excess waters like those in the present case, and in *Horst* v. *New Blue Point Min. Co.,* (1918) 177 Cal. 631 [171 Pac. 417], the court, after quoting the language we have quoted from the Gallatin case, went further and held that injunction will not be granted to restrain the diversion of water by a nonriparian proprietor at the instance of a lower riparian owner, when the amount diverted would not be used by the latter, but would greatly benefit the person diverting it.

"Plaintiff, evidently appreciating the applicability of the doctrine of the decisions cited, argues that those cases have been overruled by *Lindblom* v. *Round Valley Water Co.,* (1918) 178 Cal. 450 [173 Pac. 994], and *Herminghaus* v. *Southern California Edison Co.,* (1926) *supra.* The Round Valley case has little pertinence. . . .

"In *Herminghaus* v. *Southern California Edison Co.,* *supra,* the question involved rights to waters of the San Joaquin river found by the court to be a natural stream, with well-defined channels and banks, which, with its tributaries, rises in the Sierra Nevada mountains, and which, in its natural flow of water, varies in the course of each and

every year according to the seasons and annually recurring accretions which occur in their usual, expected, and accustomed seasons each year. Upon such findings the court held the conclusion to be inevitable that the waters of the river annually flowing therein before, during, and after the regularly recurring accretions in the volume thereof, constituted 'the usual and ordinary flow of said river, and are in no sense "storm" or "flood" or "vagrant" or "enemy" waters, as these terms are understood in law'. Earlier California decisions were referred to as fortifying the conclusion that the lands of the plaintiff were riparian to the San Joaquin river, entitled to the enjoyment of such riparian rights as they might be determined to be invested with in the entire flow of the waters of the river, 'considering the same with its seasonal accretions as the usual and ordinary flow of said stream during each and every year'.

"The case is readily distinguished from *Gallatin* v. *Corning Irrigation Co., supra,* in that in the Gallatin case the court found that waters such as flow down Suisun creek and its tributaries, and which defendant herein claims a right to take, were flood or excess waters, whereas in the Herminghaus case the waters of San Joaquin river were expressly found not to be flood waters, and for that reason were not subject to the rules applicable to flood waters. This distinction is so evident that the court in the Herminghaus case made no reference whatever to *Gallatin* v. *Corning Irrigation Co., supra.* In one important respect, however, the Herminghaus case has a bearing, namely, in the discussion recognizing the fundamental rule of *Modoc Land & Live Stock Co.* v. *Booth,* 102 Cal. 151 [36 Pac. 431], that a riparian owner should not be permitted to demand as of right the intervention of a court of equity to restrain all persons who are not riparian owners from diverting any water from the stream at points above him simply because he wishes to see the stream flow by or through his lands undiminished and unobstructed. Weil on Water Rights, pp. 880, 881."

In the present case as a part of the findings, there is a recital of a disclaimer on the part of the defendants announced by counsel for the defendants prior to their argument in the trial court to the effect that "the defendants disclaim any intention to take or impound the ordinary and usual flow of the Santa Ynez River by means of the Gibraltar

Dam'', and ''that said defendants do intend to impound by means of said Gibraltar Dam and reservoir . . . the flow of said river which occurs during or immediately after rain storms and which are in excess of the ordinary and usual flow of said river''. The court found in accordance with the disclaimer, and as hereinbefore indicated, found that the usual, ordinary and customary flow of the river consists of such waters as flow therein independently of and not as a result of heavy rainstorms; that such heavy rainstorms and consequent freshets and torrential floods are not of regular, anticipated or usual occurrence and intervals of two years and more at times occur between said storms.

In order to safeguard at all events the usual, ordinary and customary flow of the stream to which the plaintiffs are found to be entitled, the court directed that the defendant city shall, during the summer and fall months in each year, and until the ensuing rainy season, release and discharge from the Gibraltar dam, into the stream channel of the river below said dam and reservoir, waters in excess of the waters flowing into said reservoir during said period, to the extent of 616 acre-feet; and that the defendants shall make and maintain such adequate and efficient provision, in connection with their dams and reservoirs, as will permit the usual, ordinary and customary flow of the river to be discharged into the stream bed of the river below the Gibraltar dam. Provision is then made for measuring the stream flow at the dam with the right on the part of the plaintiffs, or their representatives, to inspect the measuring devices and the operation thereof and the records obtained therefrom during all business days and every business hour. These provisions were carried into the judgment.

From the foregoing provisions for the protection of, and for releasing, the usual, ordinary and customary flow of the stream for the benefit of the plaintiffs, it is further apparent, in connection with the findings as a whole, that the trial court concluded that the evidence in the case brought it within the doctrine of the Gallatin and Hilbert cases above referred to, wherein provision had been made to like effect for safeguarding and releasing the ordinary flow of the stream in recognition of the rights of riparian owners.

Thus far, on the findings above recited and quoted, the conclusions of law and judgment are supported on the doc-

trine of the Gallatin case. We pass now to a consideration of the facts as reflected in further findings of the court, which are claimed by the plaintiffs to be in their favor and to require a reversal of the judgment; also to a consideration of the law applicable thereto.

■ The plaintiffs insist that the doctrine of the Gallatin case cannot be applied to the present case because of other findings of the court. It was found "that at all times of largest natural flow of said water in said river, and at all times when there is a flow of water in said river, said water seeps underground upon said lands and saturates the sands and gravels lying and being therein". It is argued that since seepage occurs whenever there is *any* water flowing in the river channel (including extraordinary and excess as well as ordinary flow), the riparian owner is entitled to such seepage as inherent in his riparian right, and being so inherent it must be deemed of some benefit to the riparian land, however little may be that benefit, and as such is a property right which may not be taken from him without compensation. It is asserted that the impairment of the riparian estate to any degree whatever by nonriparian use is wrongful, and that in the very nature of things "no possible detriment" can be predicated only where there is "no possible benefit" from the flood. But the court also found that such seepage has no effect upon the growing of grass or crops on the lands of the plaintiffs outside of the river channel; that none of the storm, flood and freshet waters proposed to be impounded by the defendants is required to replenish and maintain the underground body of water percolating through and being in the Santa Ynez River basin or for any other useful or beneficial purpose, but on the contrary, the supply of water in said basin will be fully maintained and replenished by the flow of the river, which is not interfered with by the defendants. These findings of the ultimate facts are fortified by the specific findings as to the formation of the river channel and the flow of waters therein and that the 18,000 acre-feet proposed to be taken by the defendants are but a part (in fact less than one-third) of the 55,000 acre-feet constituting the average annual runoff of the watershed above Gibraltar dam; that the total average annual runoff is from 150,000 to 200,000 acre-feet, and that after the defendants have taken

all of the water which they propose to take there will be discharged into the sea and be lost for any useful or beneficial purpose an annual quantity of at least 121,000 acrefeet.

With reference to lands of the plaintiffs which are overflowed by the waters of the river, the court found that certain lands lie within the flood channel of the river; that the river is and for years past has been a degrading stream; that within the flood channel there is a secondary or low water channel which meanders from side to side through and within the flood channel and which changes its course from time to time following flood flows in the river; that in some places within the flood channel but above the lowwater channel, certain accretions called "montes" have occurred, which consist of sand, gravel, silt, vegetable matter and other detritus; that these "montes" vary in location and extent depending upon the shifting of the course of the flood; that during floods some of them are eroded and carried away and others are elsewhere created within the flood channel; that their total area at the time of trial was approximately 500 acres, and varied in size from three to seventy-five acres; that no more than 125 acres of these "montes" have been cultivated; that the quality of their soil is variable but generally fertile and that some of the remainder is susceptible of being cleared and cultivated, the balance being infertile and valueless for agricultural purposes. The plaintiffs claim that there is thus a showing of some benefit to said "montes". But the court found that the impounding and diversion now taking place and contemplated by the defendants will not diminish the flow of said river over said "montes" to such an extent as will prevent the necessary periodical irrigation and saturation of said "montes" and other lands lying within the flood channel of the river; that the underground basin of the Santa Ynez River contains therein, or there is percolating therethrough, water more than sufficient to irrigate all of the lands riparian to said river and its tributaries, susceptible of irrigation, and in addition thereto, all of the lands overlying said basin; that when all of said lands are irrigated said basin will be periodically replenished by the flow of said river having its source in the watershed below the Gibraltar dam.

It was also found that some of the plaintiffs have, during the summer months, pumped water from the bed of the river for domestic and irrigation uses. These uses are asserted to be riparian and beneficial to the plaintiffs' lands. That such uses are riparian is not disputed; but in this connection the court found that the waters remaining and flowing in said stream after the impounding, storage and diversion of water heretofore or intended "will be more than sufficient to replenish and maintain such underground waters". It was also found that "the part of the waters remaining and flowing in said river after the impounding, storage and diversion by defendants of the waters of said stream which they have heretofore impounded, stored and diverted, and which they intend hereafter to impound, store and divert as herein found, will be in excess of the amount of waters that is or could be put to any use beneficial to any of said lands of the plaintiffs therein. The waters of the Santa Ynez river originating below Gibraltar dam are and will be more than sufficient in amount to serve all the beneficial uses and purposes of the plaintiffs on their respective riparian lands"; that "no water whatever is devoted or used from said river by any plaintiff on his lands, or can be applied for any beneficial purpose on any of the lands of the plaintiffs, or any of them, when the river is in flood".

The plaintiffs insist that notwithstanding the findings which would bring the case within the doctrine of the Gallatin case, the further findings to the effect that seepage to some extent occurs into the sands and soils of the plaintiffs' riparian lands at times when the river is in flood, that the "montes" in the bed of the stream are overflowed whenever any flood waters flow in the stream, and that some waters are pumped from the bed of the stream in the summer season, entitled the plaintiffs to the full flow of the stream at all times, undiminished by any diversion by the defendants. It is insisted that however small the invasion of the riparian right may be and however slight the benefit may be to the riparian owner, still it must be presumed, as a matter of law, that damage to his lands has resulted entitling him to an injunction. It is to be remembered that the court has found that the waters taken and to be taken by the defendants would be of no benefit whatever to the plain-

tiffs' riparian lands, if the same were not taken, and that no injury whatever will accrue to said lands by reason of said taking.

It is contended that the plaintiffs are entitled to the protection, by injunction, of the unsubstantial and technical right which they assert under the common law of England as adopted as a rule of decision in this state in 1850 (Pol. Code, sec. 4468), and the application of the law of riparian rights then existing in England to conditions in this state. The code section reads: "The common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, is the rule of decision in all the courts of this state." This language is general in its terms. It does not mention the law of riparian rights, but has been held to include it by necessary implication. The English law of riparian rights was applied in this state in 1886 in *Lux* v. *Haggin*, 69 Cal. 255 [4 Pac. 919, 10 Pac. 674, 753], wherein it was declared (p. 390): "By the common law the right of the riparian proprietor to the flow of the stream is inseparably annexed to the soil and passes with it, not as an easement or appurtenance, but as part and parcel of it. Use does not create the right, and disuse cannot destroy or suspend it. The right in each extends to the natural and usual flow of all the water, unless where the quantity has been diminished as a consequence of the reasonable application of it by other riparian owners" for proper riparian purposes. It was also declared (p. 394) that "by our law the riparian proprietors are entitled to a reasonable use of the waters of the stream" for proper riparian purposes and that "what is such reasonable use is a question of fact, and depends upon the circumstances appearing in each particular case". This doctrine has been affirmed and reaffirmed consistently since the decision in that case. In other words, it is the established law of this state that as between riparian proprietors the right of each as against the other is confined and restricted to the amount of water reasonably necessary for useful and beneficial riparian purposes.

It is the contention of the plaintiffs that it always has been and is now the law of this state that as between a riparian proprietor and an appropriator, the doctrine of

reasonable use has no application. The plaintiffs are fortified in their position by numerous court decisions in this state. Particular reliance is placed on the cases of *Miller & Lux* v. *Madera Canal etc. Co.,* 155 Cal. 59 [99 Pac. 502, 22 L. R. A. (N. S.) 391], *Miller* v. *Bay Cities Water Co.,* 157 Cal. 256 [107 Pac. 115, 27 L. R. A. (N. S.) 772], and *Herminghaus* v. *Southern California Edison Co.,* 200 Cal. 81 [252 Pac. 607]. There can be no question but that this court since *Lux* v. *Haggin, supra,* by numerous decisions, including those particularly relied upon by the plaintiffs, has adhered to the general rule that in a controversy between a riparian owner and an appropriator the doctrine of reasonable use does not apply. Perhaps the most forceful language used by the court in any of the decisions is contained in *Miller & Lux* v. *Madera Canal etc. Co., supra.* That case involved an appeal from an order granting a temporary injunction on behalf of a lower riparian owner against an upper appropriator. It was held that the trial court had not abused its discretion in granting the temporary injunction on a showing that the use enjoined pending a hearing on the merits was against an interference with the usual and ordinary flow of the Fresno River, and that the question of the diversion of an upper appropriator of the unusual and extraordinary flood which could not *appreciably affect* or *substantially injure* the riparian rights of the plaintiff, and the application of the doctrine of *Modoc Land Co.* v. *Booth,* 102 Cal. 151 [36 Pac. 431], and *Fifield* v. *Spring Valley Water Works,* 130 Cal. 552 [62 Pac. 1054], was not involved in the case. At pages 64 and 65 [of 155 Cal.] the court said: "The doctrine that a riparian owner is limited to a reasonable use of the water applies only as between different riparian proprietors. As against an appropriator who seeks to divert water to nonriparian lands, the riparian owner is entitled to restrain any diversion which will deprive him of the customary flow of water which *is or may be beneficial* to his lands. He is not limited by any measure of reasonableness. If any doubt ever existed on this point, none can remain since the recent decision of this court in *Anaheim Union Water Co.* v. *Fuller,* 150 Cal. 327 [88 Pac. 978, 11 L. R. A. (N. S.) 1062]. . . . Neither the court nor the legislature has the right to say that because such water may be more beneficially used by others it may be freely taken by them. Public

policy is at best a vague and uncertain guide, and no consideration of policy can justify the taking of private property without compensation.'' This case was followed and applied in *Miller* v. *Bay Cities Water Co., supra,* to protect the right of a riparian owner to percolating waters as against a diversion beyond the watershed. As indicating that the rule was not as inflexible as now contended by the plaintiffs herein, the court, in the last case referred to, said at page 280: ''There can be no question but that an appropriator of water may divert for use to any point beyond the watershed any portion of the waters of a stream which can serve *no useful purpose* either to the riparian owners, or, as in the instant case, any waters of the Coyote river which might serve no such purpose in supplying the underground stratum of plaintiff or which are *in excess of the quantity necessary* for that purpose. (*Fifield* v. *Spring Valley Water Works,* 130 Cal. 552 [62 Pac. 1054].)'' The concurring opinion of Mr. Justice Shaw in that case will be later referred to.

In the Herminghaus case this court affirmed an order granting an injunction against an upper appropriator upon a finding supported by the evidence that the waters sought to be diverted were a part of the usual and customary flow of the stream and when allowed to flow in their natural way were and would be beneficial to the plaintiffs. As very pertinently noted by the United States Circuit Court of Appeals in *Hilbert* v. *City of Vallejo, supra,* the Herminghaus case did not mention nor overrule, the Gallatin case. This was so for the obvious reason that the factual situation was not the same. This court, in the Herminghaus case, reviewed extensively the water law of this state applicable to the facts found by the trial court. In doing so it quoted the foregoing language of *Miller & Lux* v. *Madera Canal etc. Co., supra,* which contains the statement that ''Neither a court nor the legislature has the right to say that because such water may be more beneficially used by others it may be taken freely by them,'' and that ''public policy is at best a vague and uncertain guide''. The question of public policy in behalf of a more liberal rule with respect to the appropriation of waters in this state was urged upon the court in *Lux* v. *Haggin, supra,* where it was said at page 307: ''A 'public policy' has been appealed to, which has not found its expression in the statutes of the state . . .

But the policy of the state is not created by the judicial department, although the judicial department may be called upon at times to declare it; it can be ascertained only by reference to the constitution and the laws passed under it, or, which is the same thing, to the principles underlying and recognized by the constitution and laws." Following that case this court has consistently adhered to the doctrine there laid down, and has refused to declare a policy in favor of a reasonable use as between a riparian owner and an appropriator.

In 1913, the legislature sought to avoid the rule adhered to by this court, by adopting the Water Commission Act (Stats. 1913, p. 1012), and incorporating therein section 11, which provided that stream waters of the state not theretofore put to a useful and beneficial purpose or reasonably needed for a useful or a beneficial purpose should be deemed public waters of the state and subject to appropriation under its laws; and section 42, which sought to place a limit to the amount of water which should be deemed, per acre, a useful and beneficial use. Under another section of the act (sec. 15), the state water commission was vested with power to declare what waters in this state were unappropriated. In *Tulare Water Co.* v. *State Water Com.*, 187 Cal. 533 [202 Pac. 874], it was held that said section 15 was an unlawful delegation of judicial power to the commission. In the Herminghaus case, although it was stated that section 11 of the act had no application to the facts in that case, in view of the supported findings of the trial court, it was further declared to be beyond the constitutional power of the legislature to assume "the right to determine" what are the "useful and beneficial" purposes to which private property—the riparian right—might be put. The right thus attempted to be interfered with was declared to be a vested right protected by an unbroken line of cases since *Lux* v. *Haggin, supra,* establishing a rule of property which it was beyond the power of the legislative department to disturb. As indicating that a judicial question is presented in each case, it was said at page 117: "The extent to which such riparian landowners need, and use, and are entitled to have the benefit of the flow and overflow of such waters under their vested riparian rights therein is a matter which depends upon the circumstances of each particular case."

In *Fall River Irr. Dist.* v. *Mt. Shasta P. Corp.*, (1927) 202 Cal. 56 [259 Pac. 444, 56 A. L. R. 264], it was declared that section 11 of the Water Commission Act was an unlawful exercise of legislative power; but this court, through Mr. Justice Preston, very significantly stated, at page 68: "We are by no means intending to say that riparian rights may not under proper circumstances yield to the police power in the interest of public health, safety, comfort or welfare," and it was held that the facts in the case did not present a situation where the police power might operate.

We are now confronted with the question whether the law of riparian rights in this state must be modified to conform to a direct and positive constitutional declaration.

Immediately following the decision in the Herminghaus case (December, 1926), the legislature in 1927 proposed an amendment to the Constitution by adding a new section known as section 3 of article XIV. The amendment was adopted by the electors of the state on November 6, 1928, and reads as follows: "It is hereby declared that because of the conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than as much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; *provided, however*, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appro-

priator of water to which he is lawfully entitled. This section shall be self-executing, and the legislature may also enact laws in the furtherance of the policy in this section contained."

In submitting the foregoing constitutional amendment to the electors of the state, the argument in support thereof made special reference to the adoption of the common-law rule in this state in 1850, the interpretation thereof in *Lux* v. *Haggin, supra,* and the adherence to the rule by the courts of this state since that decision. The purpose of the amendment was stated to be "to prevent the waste of waters of the state resulting from an interpretation of our law which permits them to flow unused, unrestrained and undiminished to the sea", and is an effort "on the part of the state, in the interest of the people of the state, to conserve our waters" without interference with the beneficial uses to which such waters may be put by the owners of water rights, including riparian owners. That such purpose is reflected in the language of the amendment is beyond question. Its language is plain and unambiguous. In the main it is an endeavor on the part of the people of the state, through its fundamental law, to conserve a great natural resource, and thereby render available for beneficial use that portion of the waters of our rivers and streams which, under the old riparian doctrine, was of no substantial benefit to the riparian owner and the conservation of which will result in no material injury to his riparian right, and without which conservation such waters would be wasted and forever lost. It was because this court felt impelled to adhere to the long-established rule of *Lux* v. *Haggin, supra,* that a constitutional amendment was made necessary. Upon the adoption of the amendment, it superseded all state laws inconsistent therewith. (Const., art. XXII, sec. 1; *People* v. *Kerber,* 152 Cal. 731 [93 Pac. 878, 125 Am. St. Rep. 93].) The amendment is now the supreme law of the state, which the courts are bound to enforce, and it must be made effectual in all cases and as to all rights not protected by other constitutional guaranties.

It is argued by the plaintiffs that the constitutional amendment is susceptible of the construction that it was not intended to interfere with the operation of section 14 of article I of the Constitution, providing that private property

shall not be taken or damaged for public use without compensation. There is a well recognized and established distinction between a "taking" or "damaging" for public use and the regulation of the use and enjoyment of a property right for the public benefit. The former falls within the realm of eminent domain, and the latter within the sphere of the police power. That the constitutional amendment now under consideration is a legitimate exercise of the police power of the state cannot be questioned. It is the highest and most solemn expression of the people of the state in behalf of the general welfare. The present and future well-being and prosperity of the state depend upon the conservation of its life-giving waters. In his concurring opinion in *Miller* v. *Bay Cities Water Co., supra,* Mr. Justice Shaw made the following appropriate comment on general water conditions in this state: "In many parts of the state, especially in the large interior valleys, practically all the flood waters are waste waters. They contribute little or nothing to the saturation of any subterranean gravel beds which are resorted to for a supply of water for useful purposes. They rush in great volume to the sea, carrying destruction in their path and overflowing the low lands to the great damage of the owners, serving no useful purpose whatever. If they were stored in reservoirs they might be made to serve a triple purpose. The extreme floods and consequent overflow and destruction would be prevented; the stored water could be used to irrigate large areas of the valley land, now left unproductive for lack of water; if distributed upon the plains, for irrigation, a large portion of these waters would in due course of time find their way by seepage and percolation to the channels of the streams, giving an increased and more regular flow in the summer months, increasing the amount available for irrigation in the smaller streams and bettering the navigation of the large rivers; all of which would add tremendously to the growth, prosperity and wealth of the state and to its ability to support the large population which its climate and productions attract. The question of the right to store such flood waters and the terms upon which it can be obtained or exercised is of the greatest importance to the future welfare of the state." In *San Joaquin etc. Co.* v. *Fresno Flume Co.,* 158 Cal. 626 [112 Pac. 182, 183, 35 L. R. A. (N. S.) 832], this court said: "The economic use

of the waters of this state is of the utmost importance to its development and well being.'' These observations are self-evident, not only under present conditions, but for all time to come. It requires no extraordinary foresight to envision the great and increasing population of the state and its further agricultural and industrial enterprises dependent upon stored water—water that is now wasted into the sea and lost to any beneficial use. The conservation of other natural resources is of importance, but the conservation of the waters of the state is of transcendent importance. Its waters are the very life blood of its existence. The police power is an attribute of sovereignty and is founded on the duty of the state to protect its citizens and provide for the safety, good order and well-being of society. It is coextensive with the right of self-preservation in the individual. (*Ingram* v. *Colgan*, 106 Cal. 113 [38 Pac. 315, 39 Pac. 437, 46 Am. St. Rep. 221, 28 L. R. A. 187] ; 12 Cor. Jur., p. 907.)

In its inception the police power was closely concerned with the preservation of the public peace, safety, morals and health, without specific regard to the general welfare. Under modern conditions it includes the general welfare which embraces regulations ''to promote the economic welfare, public convenience, and general prosperity of the community''. (*Chicago, B. & Z. R. Co.* v. *Illinois,* 200 U. S. 561, 592 [26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175].) It has been applied in this sense in cases too numerous to mention. In its exercise in this state one Hadacheck was required, without compensation, to dispense with a long-established, valuable and lawful business on property owned by him in behalf of the well-being of those acquiring residential property surrounding him without regard to whether his business was a nuisance. (*Ex parte Hadacheck*, 165 Cal. 416 [132 Pac. 584, L. R. A. 1916B, 1248] ; *Hadacheck* v. *Sebastian,* 239 U. S. 394 [36 Sup. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927].) It has been applied within recent years to the regulation of the use of property without compensation in zoning cases. (*Miller* v. *Board of Public Works,* 195 Cal. 477 [234 Pac. 381, 38 A. L. R. 1479] ; *Dwyer* v. *City Council,* 200 Cal. 505 [253 Pac. 932] ; *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 [47 Sup. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016].) A statute which prohibited the manufacture of carbon black

and other products by the use of natural gas, unless the heat generated thereby was put to some beneficial use, was upheld as a proper exercise of the police power. (*Walls* v. *Midland Carbon Co.*, 254 U. S. 300 [41 Sup. Ct. 118, 65 L. Ed. 276].) A statute making it unlawful for the owner of an oil-well to permit the escape of natural gas therefrom was upheld in *Ohio Oil Co.* v. *Indiana*, 177 U. S. 190 [20 Sup. Ct. 576, 44 L. Ed. 729]. The Oil and Gas Conservation Act of this state, designed to prevent the unreasonable waste of natural gas, was held to be constitutional in *People* v. *Associated Oil Co.*, 212 Cal. 76 [297 Pac. 536]. In the exercise of the police power the waste of water from artesian wells has been prohibited in this state. (*Ex parte Elam*, 6 Cal. App. 233 [91 Pac. 811] ; see, also, *Block* v. *Hirsh*, 256 U. S. 135 [41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165] ; *Marcus Brown Holding Co.* v. *Feldman*, 256 U. S. 170 [41 Sup. Ct. 465, 65 L. Ed. 877] ; *Levy Leasing Co.* v. *Siegel*, 258 U. S. 242 [42 Sup. Ct. 289, 66 L. Ed. 595].)

It has been stated by this court on numerous occasions that it is of the utmost importance to the welfare of the state that flood waters which have heretofore been permitted to waste into the sea be made available for beneficial uses and purposes. The people of the state through the Constitution have now pointed the way. As already observed the amendment purports only to regulate the use and enjoyment of a property right for the public benefit, for which reason the vested right theory cannot stand in the way of the operation of the amendment as a police measure. A vested right cannot be asserted against it because of conditions once obtaining. (*Chicago & Alton R. R.* v. *Transbarger*, 238 U. S. 67, 78 [35 Sup. Ct. 678, 59 L. Ed. 1204].) It has been long established that all property is held subject to the reasonable exercise of the police power and that constitutional provisions declaring that property shall not be taken without due process of law have no application in such cases. (*Odd Fellows' Cem. Assn.* v. *San Francisco*, 140 Cal. 230 [73 Pac. 987].)

The constitutional amendment of 1928 is an exercise of that power. This is especially true as applied to the facts of the present case, which is a controversy between the public, represented by the municipality and the water district, on the one hand, and the property owners asserting a vested

interest as against the exercise of the power on behalf of the public, on the other hand.

There is nothing novel about the limitation of the riparian right to a reasonable, beneficial use of water. Other western states which first adopted the common-law doctrine of riparian rights have effectually changed it to meet modern conditions.

Nevada originally adopted it and the early Nevada cases recognized it; but in 1885 it was discarded as unsuited to the conditions in that locality. (*Jones* v. *Adams,* 19 Nev. 78 [6 Pac. 442, 3 Am. St. Rep. 788].)

Arizona, in 1864, adopted the common-law riparian doctrine. Subsequently the rule was abolished. In *Boquillas Land & Cattle Co.* v. *St. David Co-op. Commercial & Development Assn.,* 11 Ariz. 128 [89 Pac. 504], it was held that the riparian right was not such a vested right as to be immune from statutory change. The holding was affirmed in *Boquillas Cattle Co.* v. *Curtis,* 213 U. S. 339 [29 Sup. Ct. 493, 53 L. Ed. 822].

In the state of Washington the earlier cases were not in harmony, but whatever confusion existed was set at rest in *Brown* v. *Chase,* 125 Wash. 542 [217 Pac. 23], where the court held, ''that the waters of non-navigable streams in excess of the amount which can be beneficially used, either directly or prospectively, within a reasonable time, are subject to appropriation for use on non-riparian lands''. This rule was reaffirmed in *Proctor* v. *Sim,* 134 Wash. 606 [236 Pac. 114], *State* v. *American Fruit Growers,* 135 Wash. 156 [237 Pac. 498], and *Hunter Land Co.* v. *Laugenour,* 140 Wash. 558 [250 Pac. 41].

Oregon in 1909 checked the extension of the old common-law doctrine of riparian rights, recognizing, however, certain rights secured prior to 1877. (*Hough* v. *Porter,* 51 Or. 318 [95 Pac. 732, 98 Pac. 1083, 102 Pac. 728].) Thereafter the legislature adopted a water code limiting the riparian owner to a reasonable beneficial use. The code was upheld. (*In re Willow Creek,* 74 Or. 592 [144 Pac. 505, 146 Pac. 475].) Its constitutionality was again affirmed in *In re Hood River,* 114 Or. 112 [227 Pac. 1065].

Nebraska has limited the riparian owner to a beneficial use. (*Crawford* v. *Hathaway,* 67 Neb. 325 [93 N. W. 781, 108 Am. St. Rep. 647, 60 L. R. A. 889].)

Texas has adopted the reasonable use theory as affecting the riparian right. (*Biggs* v. *Lee,* (Tex. Civ. App.) [147 S. W. 709].)

The Supreme Court of the United States has applied the doctrine of reasonable use as between states (*Kansas* v. *Colorado,* 206 U. S. 46 [27 Sup. Ct. 655, 51 L. Ed. 956]), where "perceptible" injury resulted to riparian owners.

 Additional cases from other jurisdictions might be cited. A general survey of them discloses that whenever the riparian right has been deemed a vested right, such right has become defined to be, or limited to, the right of the riparian owner to make a reasonable or beneficial use of water. Although the riparian right in this state has not heretofore been so defined and limited, a limitation of the right as thus defined has now become the law of this state whenever, under situations of fact calling for its proper exercise in behalf of the people of the state, the doctrine of police power may be applied. The present case presents such a situation of fact, and the eminent domain provisions of the Constitution have no application.

 The plaintiffs insist that even if the constitutional amendment of 1928 be deemed to be in harmony with the other provisions of the state Constitution, it is nevertheless in contravention of the due process clause of the federal Constitution. As a measure adopted in the exercise of the police power, it would seem not to be open to attack on any theory announced by the Supreme Court of the United States. Furthermore, that court has said that "every state is free to change its laws governing riparian ownership and to permit the appropriation of flowing waters for such purposes as it may deem wise. *United States* v. *Rio Grande Irr. Co.,* 174 U. S. 690, 702 [19 Sup. Ct. 770, 43 L. Ed. 1136]." (*State of Connecticut* v. *Commonwealth of Massachusetts,* 282 U. S. 660 [51 Sup. Ct. 286, 289, 75 L. Ed. 602].)

 It is contended that the terms of the constitutional amendment are too uncertain to be effective; that the amendment uses the words "reasonable" and "unreasonable" without the statement of any facts which, if existing, would constitute reasonableness or unreasonableness. Objection was made in the Herminghaus case to the terms of section 42

of the Water Commission Act which purported to define what amount of water in acre-feet should be deemed a useful and beneficial purpose. The objection was sustained on the ground that it was beyond the power of the legislature so to provide, and that "the extent to which such riparian land owners need, and use, and are entitled to have the benefit of the flow and overflow of such waters under their vested riparian rights therein is a matter which depends upon the circumstances of each particular case". (*Herminghaus* v. *Southern California Edison Co., supra.*) This is but another way of saying that what is a useful and beneficial purpose and what is an unreasonable use is a judicial question depending upon the facts in each case. Likewise, what is a reasonable or unreasonable use of water is a judicial question to be determined in the first instance by the trial court. There would seem to be no more difficulty in ascertaining what is a reasonable use of water than there is in determining probable cause, reasonable doubt, reasonable diligence, preponderance of evidence, a rate that is just and reasonable, public convenience and necessity, and numerous other problems which in their nature are not subject to precise definition but which tribunals exercising judicial functions must determine.

 As applied to the case at bar, there can be no doubt that the use to which the plaintiffs insist they have the right to put the flood waters of the Santa Ynez River appropriated and used or to be used by the defendants is an unreasonable use as contemplated by the constitutional amendment, since it is an established fact in this case that such use is and can be of no substantial or any benefit to said riparian lands; that the waters to be taken and used by the defendants are not and never can be used or be put to any beneficial or useful purpose by the plaintiffs; that the appropriation and use of said water by the defendants will not result in any injury whatever to said riparian lands; that the waters of the river, exclusive of those taken or to be taken by the defendants, will be more than sufficient to supply all of the riparian needs of the plaintiffs; and that even after the proposed appropriation and use by the defendants an annual runoff of 121,000 acre-feet of water will be washed into the sea.

Counsel for the plaintiffs made an extended and critical analysis of the findings in an endeavor to show that they are contradictory and uncertain to such an extent that no judgment for the defendants may be founded thereon. It is argued that if particular findings be taken as supporting the theory of the Gallatin case, such findings are inconsistent with other findings to the effect that some seepage into the lands of the plaintiffs occurs whenever there is any water flowing in the stream; that some water is pumped from the bed of the stream in the summer-time; that some land near the ocean is overflowed in times of flood; and that in the presence of the latter findings the doctrine of *Lux* v. *Haggin*, *supra*, and subsequent cases to the same effect is controlling. But under the facts as found by the trial court, considered in the light of any construction placed thereon by counsel for the plaintiffs, the findings support the judgment under the law as now in effect. We therefore find no inconsistency in the findings which is subject to just criticism.

■ Finally, it is insisted that in any event costs should have been awarded to the plaintiffs as against the defendants. The trial court directed ''that each of the parties bear his, her or its costs''. The action is equitable in its nature and costs were allowed, apportioned or withheld in the discretion of the court under section 1025 of the Code of Civil Procedure. (*Gallatin* v. *Corning Irr. Dist.*, *supra.*)

No other points require discussion.

The judgment is affirmed.

Langdon, J., Curtis, J., Waste, C. J., Seawell, J., and Thompson, J., concurred.

Preston, J., dissented.

Rehearing denied.

Preston, J., dissented.